Pece, J.,
delivered the opinion of the court:
Amherst H. Wilder, of Minnesota, represents that he entered into a written contract with the defendants, on the 1st day of *471 July, A. D. 1866, to receive from and transport for them all the military supplies that they might require to have transported, until the 1st day of July next following, for the military district of Minnesota, from any one point to any other point therein. The defendants reserved the right to transport all stores during the continuance of the contract by their own means of transportation, whenever the same might be available, except this: No other means of transportation were to be resorted to by the defendants, who obliged themselves to employ the claimant to do all their transportation at fixed prices per mile for each 100 pounds weight transported from place to place; the prices varying as the services might be performed in different months of the year.
The contract was entered into upon the condition that it should be “subject to the approval of the Quartermaster General of the United States Army and the chief quartermaster Department of the Platte.”
The contract was executed for the defendants by Theodore Schwan, who signed himself, “Oapt. 10th Inft., A. A. Q. M;” he also affixed his seal.
1. We find the facts to be, that the contract was approved by the Quartermaster General of the United States Army and the chief quartermaster of the Department of the Platte, and so became obligatory upon the defendants.
2. That the claimant entered upon the performance on his part without delay, and was prepared to execute, and did execute, when so requested, all the duties devolved by the contract upon him.
3. That the defendants, against the remonstrance and objections of the claimant, did, on the 18th day of March, A. D. 1867, enter into a written contract with one Charles A. Buffee; by which it was agreed that the defendants should deliver to him all such military stores and supplies, to be transported, as they should require to have transported within the said military district of Minnesota, from the 1st day of April, A. D. 1867, to the 31st day of March, A. D. 1868; and that they did, from and after the said 1st day of April, A. D. 1867, deliver to the said Charles A. Buffee all the military stores and supplies which they required to have transported to and from different places and points; and refused to give such military stores and supplies to the said claimant, to be by him transported, as they *472 bad obliged themselves to do by their contract with him, during the months of April, May, and June, A. D. 1867.
4. That the supplies transported by said Charles A. Ruffee, during the said months of April, May, and June, A. D. 1867, which the claimant offered to transport, but was not permitted to transport, would have entitled the claimant to demand and receive for the transportation of them, under his contract, the sum of $56,904 84, or thereabouts.
5. That the claimant had made great outlay in preparing to do the said transportation during the said months of April, May, and June; and that he was fully prepared to do the same, in all respects, in compliance with his contract.
6. That had the claimant been permitted to do the said transportation upon the terms and conditions stipulated for by the said contract, that he would have been benefited thereby, and would have made gain by so doing.
7. That claimant did, prior to the said months of April, May, and June, 1867, during the time stipulated by his contract, and in the life thereof, do and perform a large amount of transportation by virtue thereof for the defendants, at different times and to different places, at the request of defendants, to the value of a large amount, for which vouchers, in the usual form, were issued at different times; all of which were paid, by the direction of the Quartermaster General of the United States.
Applying the law to these facts, we are of opinion that the claimant is entitled to recover of the defendants, by reason of the breach of said contract on their part, so much gain or profit as he would have made for the services under the contract, which he had a right to render, but which he was not permitted by the defendants to render; deducting therefrom a reasonable sum “for the less time engaged, and for release from the care, trouble, risk, and responsibility attending a full execution of the contract.”
Recurring to the objections made by the Assistant Attorney General to a recovery by the claimant, which were that the contract was fraudulently entered into by the officer acting for the defendants, inasmuch as he did not award the contract to the lowest bidder; that the contract was not formally approved by the Quartermaster General and the quartermaster of the Platte, we have to say that the first objection is not sustained by the evidence, but is contradicted by it.
*473 A disappointed competitor for tbe contract preferred charges against the officer who executed it; whereupon an investigation was instituted and conducted on behalf of the defendants, in their own way and by their own inquisitors, without any participation by the claimant, if, indeed, he had any knowledge of it.
This investigation resulted in exonerating Captain Schwan from all blame in the premises. So far, the contract is relieved from all suspicion, even of any taint which should impair its validity.
As to the second objection of the Assistant Attorney General, we do not find in the contract itself, or in the rules of law applicable to it, any direction or requirement about the manner of approval. The approval may be evidenced in any way which would satisfy the mind that the contract was acceptable to those who, by its terms, were to pass upon it. There was no stipulation, either, as to the time within which the approval should be made.
It might be inferred from the character of the service required by it, and the necessity for that service, as indicated by the making of such a contract, that it might well be regarded as approved, when the contrary was not manifested by a direct disapproval within a reasonable time after the contract had been submitted for that purpose. Silence might be considered as acquiescence, and acquiescence as an approval. Between citizens, he who is silent when he should speak cannot be heard when his silence has worked an injury to another. The law requires that all contracts with the government shall, as soon as made, or within thirty days at most, be forwarded to the Department at Washington; and it is to be presumed that officers do their duty, and, therefore, that the Quartermaster General was duly informed of the existence of this contract, and the incidents connected with it, such as advertisement, bids, &c. There is no pretense that he was ignorant of what had been done in this regard.
The contract was approved by the quartermaster of the Department of the Platte soon after it was executed. The claimant, as must or should have been known to both the officers who were to approve the contract, was almost from its very date necessarily employed in the direct performance of the duties he had engaged to perform under it. No other means of transportation had been provided, as they must have known. *474 Knowing these things, if any' formal approval had been necessary, good faith required it should have been given, or if not given, refused without unnecessary delay.
It appears from the official documents in the record, that long after the claimant had been engaged in the performance of the contract, amt as late as the 15th of September, seventy-five days from its date, the Quartermaster General, in a letter to the quartermaster of the Division of the Mississippi, which letter was not communicated to the claimant, signified his disapproval of the contract, and thereby directed that payment upon the contract should be suspended. This language does not imply that the contract had not before then been approved, or that it was then abrogated by disapproval. The suspension necessarily had reference to a time only, and for a particular purpose, which, was for an inquiry into the fairness with which it had been made. After the investigation into the conduct of the officer who had signed the contract had been made, and he was acquitted of fault in the transaction, on the 16th of November following instructions were issued from the office of the Quartermaster General, to the chief quartermaster at St. Louis, as follows :
“ General J. D. Bingham, inspector Quartermaster’s Department, having reported as the result of the investigation made by him, that the contract between Captain Theodore Schwan, acting assistant quartermaster at St. Paul, Minnesota, and A. H. Wilder, dated July 1, 1866, was not in his opinion attended with fraud, as had been charged, payment of the accounts of A. H. Wilder for transportion performed under said contract, which was ordered by the Quartermaster General to be suspended by letter of September 15,1866, to General L. 0. Easton, will be resumed. Please give immediate instructions accordingly.”
Here was a revocation of the order directing a suspension of the payments, and a resumption of them, distinctly recognizing the existence of the contract as such. Although the Quartermaster General insists that his disapproval of the contract on the 15th of September has not been withdrawn, we think this is erroneous. The language of the order above quoted, directing payments to be resumed, after the contract was found to be untainted, the suspicion for which was the reason assigned for suspending payments, and not the want of a direct approval of *475 tbe contract by tbe Quartermaster General, it is fair to presume that tbe contract bad before then been recognized and accepted. As bas already been said, no set words were indispensable as signifying an approval.
If tbe contract bad been found to bave tbe taint of fraud in it at its inception, tbe approval, whether direct or indirect, would bave been worthless and nugatory, and tbe approval and tbe contract would bave fallen together. When, however, it was ascertained that tbe instrument was disconnected with fraud, it was without objection, and tbe contract and approval ' continued in full vigor. Tbe discretion left by tbe contract with tbe Quartermaster General, to approve or disapprove having once been exercised by him, bis discretion in that regard was ended. He could not capriciously withdraw any approval theretofore given, so as to curtail tbe time expressed for tbe duration of tbe contract. We think our ruling upon this branch of tbe case is upheld by that of The United States v. Speed, (8 Wallace, p. 83.)
The letter of the Quartermaster General of the 15th of September, suspending payment, &c., does not appear to bave been communicated to tbe claimant. It does not appear that any information was at any time given to tbe claimant that there was any intention to disapprove bis contract, until tbe 21st of February, A. D. 1867, nearly eight months after it bad been executed, during all which time be bad faithfully performed on bis part what was required of him by it.
I will here for myself, not speaking for any other member of 'the court, state my opinion, that contracts entered into by officers as agents of tbe United States, who affix their individual seals thereto, are not to be regarded as having tbe legal attributes and qualities of contracts under seal, in so far as the United States are concerned. Quartermasters, commissa-saries, and other commissioned officers of tbe Army, as such, bave no seals; nor are they the custodians of tbe seal of the United States, or authorized by any law within my knowledge to affix that or any other seal, so as to bind tbe United States in any manner by that means.
I should construe such instruments as I would any unsealed instrument, as a writing declaring for greater certainty tbe object, intent, and obligations assumed; and, therefore, on tbe *476 part of tbe United States, subject to the same rules of interpretation as all contracts reduced to writing but not sealed.
• In ascertaining the damages proper to be allowed for the refusal on the part of the defendants to observe its obligations toward the claimant, as fixed by the contract, we adopt the rule so well stated by the Chief Justice of this Court, in his opinions in the cases of Floyd and Speed, reported on p. 429 of the second volume of the Reports of the Court of Claims, which has received the approval of the Supreme Court in the same cases on appeal, as stated in the case of The United States v. Speed, already referred to, (8 Wallace R., p. 77.)
We make a reasonable deduction from the full amount of damages claimed, “because of the relief of claimant from responsibility for the performance of a large part of the contract, and for the time and trouble which a full performance would have required of, and imposed upon, him.” After doing this, we find he should recover the sum of $13,071 89, and direct a judgment to be entered in his favor for this sum.