Bichardson, J.,
delivered the opinion of the court:
The claimant Brawley entered into a written contract with the deputy quartermaster-general, chief quartermaster of the military department of Dakota Territory, bearing date May 6,1871, to sell, furnish, and deliver at the post of Fort Pembina 880 cords of wood, more or less, as should be determined to be necessary by the post-commander for the regular supply, in accordance with Army regulations, of the troops and employés of the garrison of said post for the fiscal year beginning July 1,1871.
The articles of the contract, material to this case, are as follows:
“I. That the said Daniel F. Brawley, his heirs, assignees, administrators, and executors, shall sell, furnish, and deliver, cut and split in lengths of 4 feet, duly piled or corded, under the direction and supervision of the post-quartermaster, within the inclosure of the post of Fort Pembina, Dak., 880 cords of sound, of first quality, of merchantable oak wood, more or less, as shall be determined to be necessary by the post-commander *529 for the regular supply, in accordance with Army regulations, of the troops and employés of the garrison of said post for the fiscal year beginning July 3, 1871, and ending June 30, 1872. The delivery of 880 cords to be completed on or before January 1, 1872, but any additional number of cords of wood that shall be required over and abbve that amount may be delivered from time to time, regulated by the proper military authorities, based upon the actual necessities of the troops for the period above mentioned; provided, that if the wood be less than 4 feet in length, due allowance shall be made for such shortage by an increased quantity, the cubical contents of the wood being measured in all cases. Delivery on this contract to begin on or'before July 15,1871, unless the time be extended by the commanding officer of the post.”
# # # # # # *
“III. That, in case of failure on the part of said Daniel F. Brawley, his agents, heirs, and assignees, party of the second part, to deliver any part of the 880 cords, more or less, of wood, as stipulated by this contract, then the said Lieut. Col. S. B. Holabird, deputy quartermaster-general United States Army, his agent, or successor, party of the first part, shall have power to supply the deficiency by purchase, or otherwise, and the said Daniel F. Brawley, his heirs and assignees, party of the second part, shall pay the difference in cost, using any money due the contractor at the time of such failure, to pay the difference on supplying the deficiency above mentioned.” #####*#
“Y. That the said Daniel F. Brawley, party of the second part, shall receive the sum of $3.99 per cord for each and every cord of wood delivered and accepted, as stipulated' in articles I and II of this agreement; and that, at any time, when 200 cords of wood have been delivered, inspected, and received, a voucher may be given and payment made for 100 cords of the same, and thereafter for such amount as may be delivered until the final delivery, when the 100 cords retained shall be paid for on final settlement.”
The contract was made in accordance with the requirements of law, after advertisements published in the newspapers inviting proposals, and the claimant Brawley was the lowest bidder. The written contract executed by the parties was duly approved by the major-general commanding the depart *530 ment and by the lieutenant-general commanding the Military Division of Missouri.
The proposals were opened on the 15th day of April, and the award was made to Brawley on the 6th of May, but the formal written contract thereon was not signed by him until the 14th of June, 1871, when it was sent to him to be executed, and was by him signed and returned on or about that day.
The language of the claimants written bid was that he agreed to “furnish at Fort Pembina 880 or more cords of wood, at $3.90 per cord, in accordance with advertisement for proposals.’7 No copy of the advertisement referred to is in evidence, and it does not appear whether the form of the claimant’s bid followed the terms of the public notice inviting proposals or not. Nor is it material to determine what were the terms of either the advertisement or the bid, since the action is not founded thereon nor upon the award, but upon a formal written contract, carefully and artistically drawn and signed by the parties at a subsequent date, into which all previous agreements were merged, and which superseded the advertisement, bid, and award, and the obligations created thereby. It is manifest that the terms of the written contract differ materially in important particulars from those of the written bid, and that the claimant assumed thereby quite different obligations from those which he offered to undertake. But the plain lauguage of a written contract cannot be set aside, contradicted, or varied by evidence of conversations, declarations, agreements, or writings between the parties made previously thereto. (1 Greenleaf’s Evidence, §§ 275-278 5 Harvey v. The United States, 8 C. Cls. R., 501.)
Before the 14th of June, but at what precise time it does not appear, the claimant, having learned that he was a successful bidder, cut all of the 880 cords of wood which he supposed would be required, and engaged, employed, and moved at considerable expense and trouble, teams sufficient to transport the same to Fort Pembina, and provided men and supplies therefor. Fifty-ñve cords of wood had been actually hauled to the fort before the contract was signed, and between that time and the time of his receiving notice that only 40 cords would be required, he hauled 20 cords more to that place. Subsequently, having the balance of the 880 cords cut, he hauled the same to within about 25 rods of the fort, and left it *531 on land of the claimant Myrick, because it was not safe, by reason of fires, to leave it in the woods where it was cut.
Four days after the execution of the contract, and as soon as he knew of it, the post-eommander orally notified Mr. Brawley that only 40 cords would be required on the contract 5 and, on the 1st day of July, the very day on which the contract went into operation, like notice was given to the claimant in writing.
Brawley,complained to the commanding general, upon receiving the first notice, and that officer disapproved of the action of the post-commander 5 but soon afterward, upon a full written report of the case, reversed his own action, and approved of that of the post-commander.
The defendants7 officers received’ and accepted only 40 cords of wood, which have been paid for, and the claimant brings this aetion to recover damages for non-fulfillment of the contract on the part of the defendants in refusing to receive and accept the remaining 840 cords, which he claims he was bound to deliver and the defendants to receive. The petitioner does not attempt to prove, and does not set forth in his petition, that the post-commander acted fraudulently toward him, or was mistaken in estimating that only 40 cords of wood would be required by the necessities of the fort for the fiscal year commencing July 1,1871, and the court expressly finds that no more was needed. The petitioner therefore relies wholly upon the construction of the contract, by which he maintains that the defendants were bound to receive and accept the full 880 cords mentioned therein, excepting only a slight variation from that quantity either way, provided for by the words “ more or less,” the force and effect of which he would thus limit to a small percentage of the quantity mentioned.'
There is no express agreement to be found anywhere in the contract that the defendants would accept 880 cords of wood, or any other quantity, from the claimant; while, on his part, he covenanted to sell, furnish, and deliver, cut, split, piled, and corded, that quantity, more or less, as should be determined by the post-commander to be necessary for the fort. When a contract of this kind between the United States and a contractor is thus unilateral in its express agreements, it has been held that the implied obligation of the United States to receive and accept is co-extensive with the express obligation of the contractor to deliver the articles specified. Such seems to have been the
*532 opinion of tbe Supreme Court, as expressed in Speed’s Case, (8 Wall., 77.) And this court expressly so decided in Caldwell’s Case’, (8 C. Cls. R., 335.) The judgment in that case was .reversed, on appeal, by the Supreme Court, on other grounds, and •this point was not again considered there.
It is necessary, therefore, to determine what were the obligations of the contractor Brawley, in order to ascertain the legal undertaking and liability of the defendants, and the case turns upon the coustruction of the language of the contract, and especially upon the force and effect of the words “ more or less ” in the connection in which they are used therein. If the contractor was bound to deliver 880 cords of wood, no more and no less, under any circumstances, then the defendants were bound to accept and pay for that quantity, and are answerable in damages if they have not done so upon the readiness and offer of the claimant to perform his part of the agreement.
The words- “more or less” and their equivalent, “about,” “ say,” and “ by estimation,” are frequently introduced into bills of sale and contracts to deliver goods, wares, and merchandise, following or qualifying a statement of specific quantity, weight, or bulk, and courts have been called upon to determine their force and effect upon the more certain and definite words to which they are attached, and how far the obligations of the parties are modified thereby. The j udicial decisions have not uniformly followed the samé interpretation of these words; but, in our opinion, the true rules, so far as this case is concerned, are the following, which we think are supported by judicial authority and justified on principle:
1. When the contract is for the sale or delivery of a specifically-named quantity of goods or articles, and the words “ more or less ” are added, with no reference to any other method of determining more exactly the quantity intended, or of removing the uncertainty created by those words, then the parties will be held to a quantity approximate to that. specifically-named, allowing only such a slight variation therefrom as, from the circumstances of the case or the nature of the articles to be delivered, may seem to the court to be reasonable.
This was substantially the view taken by this court in Hardy v. United States, (9 C. Cls. R., p. 245.) Hardy had, by contract, bound himself to transport, for the United States, 486 tons, more or less, of stores from Hardyville to Fort Whipple, *533 and 351 tons, more or less, from Hardy ville to Camp Lincoln. While the contract was in force the defendants furnished only 78J tons, leaving 758-J- tons which were not offered for transportation. The court held that the exact number of tons, as qualified by the words more or less, “ might be slightly varied by either party without infringing his obligation or in any way defeating the actual intent and meaning of the contract.” “But,” says Judge Milligan, in delivering the opinion, “the defendants had no more right to withhold one half, one third, fourth, or fifth of the number of tons mentioned than the claimant had to refuse to transport the same quantity when offered. To give the words more or less, or their equivalents, such an interpretation would defeat every contract into which they may be inserted, and render ineffectual all attempts to provide slight discrepancies which business or convenience may require.” And the complainant had judgment for damages for the nondelivery by the defendants of 758-J tons specified in the contract.
In Cabot v. Winsor et al., (1 Allen, 546,) which was an action upon a contract for the delivery of 500 gunny-bags, “ more or less,” the supreme court of Massachusetts held the same doctrine; and Judge Bigelow, in his opinion, very clearly expresses the reasons for it. lieferring to the words more or less, he says, “ As applied to quantity, they are to be construed as qualify ing a representation or statement of an absolute and definite amount, so that neither party to a contract can avoid it or set it aside by reason of any deficiency or surplus occasioned by no fraud or want of good faith, if there is a reasonable approximation to the quantity specifically named as the subject of the contract. In sales of merchandise, especially in large quantities, where it is impossible to ascertain with precise accuracy the number or weight of the articles before concluding the contract for the purchase, it is necessary and usual to insert the words ‘ more or less ‘ or ‘ about? in connection with the specific amount which forms the subject of the contract, in order to cover any variation from the estimate which is likely to arise from difference in weight, errors in counting, diminution by shrinking, or other similar causes.”
In each of these eases which we have cited, it will be seen that the contract was for a definite quantity, with the words ■“ more or less ” added thereto, without reference to any other *534 method of determining and making certain what appeared to be rendei’ed uncertain by the latter words. To give force to the words u more ox less,r in such connection to the full extent of their literal meaning would be to allow either party practically to avoid the whole contract, except as to the price of the goods actually delivered and accepted. This would be cl early an unreasonable construction, and not in accordance with the plain intent of the parties.
2. When the contract is for the sale or delivery of a specifically-named Quantity of goods or articles, and the words “ more or less” are added, with a reference to something by which the exact quantity intended can be ascertained and the uncertainty created by those words can be removed, then the words u more or less” will not be restricted to a small quantity, but will limit or extend the quantity expressed to that which may be determined by the reference, and the parties will be held to deliver and accept the latter quantity. (See Swilkie v. Daniell, 2 Comp. Mees. & Roscoe., 61; Faure v. Martin, 3 Selden, 210.)
The complainant’s ease comes within this second rule.
The contract upon which this action is brought is not for the delivery of 880 cords of wood, more or less, but for that quantity, “ more or less, as should be determined to be necessary by the post-commander for the supply, in accordance with Army regulations, of the troops and employés of the garrison of said fort for the fiscal year beginning July 1, 1871, and ending June 30,1872.” The necessities of the fort as they should be determined by the post-commander were to fix the quantity called for by the contract, and by a reference to those necessities so determined, all uncertainty arising from the use of the words “ more or less n might easily be removed.
That the reference to the necessities of the fort was inserted for the express purpose of limiting materially, if occasion should require, the estimated quantity previously stated, may be inferred from the circumstance that it was a judicious and cautious provision on. the part of the quartermaster to prevent the terms of the contract from coming in conflict under any circumstances with that part of the Act March 2, 1861, which is now incorporated into the Eevised Statutes as follows :
“ Sec. 3732. No contract or purchase on behalf of the United States shall be made unless the same is authorized by law, or *535 is under an appropriation adequate to its fulfillment, except in the War and Savy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.”
Had the deputy quartermaster contracted for the delivery of a definite quantity, supposing that it' would be neeessary during the current year, in the absence of fraud we have no doubt that the defendants would have been bound thereby, even if it proved in the end that a much less quantity only was necessary. But in this ease the deputy quartermaster chose to refer to the necessities of the fort and the determination of the post-commander for the exaet quantity required, and both parties agreed thereto by adopting the language of the contract which we have cited.
And there is other language in the contract which shows conclusively, we think, that the words “more or less” were not intended to be restricted to a small variation only of the quantity named, but were to have their full force and effect, and that it was contemplated that the quantity, if the necessities required it, might be increased much beyond the 880 cords therein specified.
In the first article it is thus provided : “ The delivery of 880 cords to be completed on or before January 1,1872, but any additional number of eords of wood that shall be required over and above that amount may be delivered from time to time, regulated by the proper military authorities, based upon the actual necessities of the troops for the period above mentioned.” Here we have the necessities of the troops referred to again, and provision made for allowing the contractor ample time for delivering whatever quantity those necessities should require above the 880 cords. This provision would have been wholly unnecessary and would certainly not have been inserted in the contract if it had been understood by the parties that the quantity would be increased above the 880 cords only to a very small extent. It implies not a slight and accidental increase arising from the ordinary course of business, but contemplates a large additional requirement under certain circumstances, and so large as to give the contractor further time in which to deliver the additional quantity. And the time of delivery was also to toe regulated by the actual necessities of the troops for the period specified, precisely as the quantity, more or less, was to be *536 regulated and determined. If, then, tbe quantity • might be greatly enlarged above the 880 cords, should the necessities of the troops require it, so, under the same language of the contract, it might be greatly diminished according to such necessities.
The words “the delivery of 880 cords to be completed on or before January 1, 1872,” taken by themselves, would imply an obligation to deliver that full quantity -7 but when taken in connection with the other provisions of the article, as they must be, it is clear that they do not extend the obligations of either party beyond the necessities of the fort, which were then estimated to require 880 cords, but were left to the future determination of the post-commander.
This constrnotion of the first article which we have adopted is in harmony with the language of the third article, where the same uncertainty is expressed by a reference to “any part of the 880 cords, more or less,” and especially with the terms of the fifth article, wherein the defendants agree to pay the contractor the sum of $3.99 per cord for each and every cord of wood “ delivered and accepted as specified in articles 1 and 2.” The only express agreement of the defendants was to pay for what was accepted under the first and second articles, and the only implied agreement was to accept what wood the fort required for the fiscal year. This construction does not leave the words “ 880 cords” without force and effect under all circumstances} for unless the post-commander should determine that the necessities of the fort would require a greater or less quantity, they would stand as fixing the quantity to be delivered and accepted.
When the contract was executed and delivered, but not before, it was the duty of the post-cornmauder to notify the claimant, within a reasonable time, of the extent of the necessities of the fort, if he determined that they would require a quantity of wood less than the 880 cords, and this he did with such promptness and care that no laches can be attributed to the defendants. As soon as he was informed of the execution of the contract, and only four days after it was. signed, and twelve days before it went-into operation, he notified the claimant orally that only 40 cords of wood would be required. And again, on the very day of the contract taking full effect, he repeated the notice to the claimant in writing. This was due diligence on his part. On the other hand, the claimant made haste to cut all the wood *537 be supposed would be required, incurred great expenses in preparations for hauling, and actually hauled a part of it to the fort before the contract was signed. After the contract was executed, and before receiving notice of the quantity required, he hauled to the fort only 20 cords, and those had been previously cut, and he has been paid for twice that quantity by the defendants.
The fact that the commanding-officer first disapproved of the action of the post-commander in limiting the quantity to 40 cords does not alter the case, because he soon after reversed his own action, and it does not appear that the claimant incurred any expenses or delivered any wood in the mean time.
When it was ascertained what quantity of wood would be actually necessary for the supply of the troops at the post of Fort Pembina for the fiscal year commencing July 1,1871, by the determination of the post-commander, according to the terms of article 1, of the contract, and due notice thereof was seasonably given to the contractor, the obligations of both parties were fixed thereby, and the contractor was under no obligation to deliver, nor the United States to receive and accept, more than the 40 cords so determined to be necessary.
Whatever losses the claimant may have suffered by cutting and hauling more wood than the post-commander determinéd to be necessary, were caused by his own hasty and imprudent acts in commencing operations before the contract was signed, and before he had given the post-commander the time and opportunity to determine the quantity required, and must fall upon himself, and not upon the defendants, who have paid him for all they have accepted and for all they were bound to receive.
For these reasons judgment must be entered that the claimant’s petition be dismissed.
Several other defenses were made by the Attorney-General at the trial, but it is unnecessary to consider them, as those which we have reviewed are deemed sufficient to dispose of the case.
Loring-, J., was not present at the trial of this case, and took no part in the decision.