PITTSBURGH BESSEMER STEEL RAIL CO. *v.* HINCKLEY.

*(Circuit Court, N. D. Illinois. 1883.)*

1. CONTRACT TO SELL AND DELIVER STEEL RAILS—BREACH.

As, construing the contract, the breach of which is alleged in this case, in the light of the parol testimony, it appears that the giving of directions by defendant, as to how the steel rails which plaintiff was to deliver to him should be drilled, was a condition precedent to be performed by him before plaintiff could proceed with the proper execution of its contract, the neglect and final refusal of defendant to give such directions was of itself a breach of the contract, which excused plaintiff from the actual manufacture of the rails, and an actual tender of them to defendant, and for such breach of contract it is entitled to damages.

**2. Same—Measure of Damages—Profit.**

The rule in awarding damages in such a case for a breach of contract is to make the plaintiff as nearly whole as he can be made in money damages; or, in other words, to leave him as nearly as possible as well off as he would have been if defendant had performed his contract; and he is entitled to recover the actual profit that he would have made had the contract been performed.

At Law.

*Jewett, Norton & Larned*, for plaintiff.

*Geo. W. Cotherin*, for defendant.

Blodgett, J. This is an action to recover damages for the alleged breach by defendant of a contract made between himself and the plaintiff on the eighteenth day of February, 1882, whereby plaintiff sold to defendant 6,000 gross tons of first quality steel rails, to weigh 52 pounds to the yard, for which defendant agreed to pay plaintiff at the rate of $58 per ton of 2,240 pounds, delivered free on board cars at Chicago, Illinois; 1,000 tons of which rails were to be delivered in May, 1880, and the balance delivered at the rate of 2,500 tons per month, after July 1, 1882. By the terms of the contract, the rails were to be drilled as directed by the defendant.

It appears from the proof in the case that the plaintiff notified the defendant in the forepart of the month of April that it would be ready to commence rolling, the week ending May 5th, the 1,000 tons of rails which were to be delivered in May, and requested him to forward drilling directions at once. This the defendant neglected to do, but requested the plaintiff to delay rolling the rails for the May delivery. Plaintiff did so delay to roll and deliver any rails in May, but during the month of May again urged the defendant to furnish drilling directions, in order that it might commence the performance of its contract; and from time to time, during the months of May, June, and July, defendant was repeatedly requested to furnish drilling directions, and repeatedly requested to take said rails, but declined to do so, and finally, in the latter part of the month of July, defendant absolutely refused to give drilling directions for the manufacture of said rails, and notified the plaintiffs that he could not and would not accept and pay for them. The proof also shows that immediately after the making of the contract between the plaintiff and defendant the plaintiff purchased the material out of which to manufacture the rails called for by the contract, and was, at all times up to the time of the absolute refusal of the defendant to accept said rails, ready and able to manufacture said rails and deliver the same according to the terms of the contract.

The contract, taken in connection with the parol testimony in the case, satisfies me that the drilling directions—that is, the directions where and how to drill the holes near the ends of the rail by which the fish-plates or splice-bars are bolted to the rails—was an important item in the manufacture of the rails, and that if the plaintiff had made the rails and drilled them without the directions of the defendant, he could legally have refused to accept them on that ground, as

it appears from the proof that drilling is now considered a part of the manufacture of the rails; that a steel rail is usually drilled by the manufacturer; and that the purchaser gives directions as to how it shall be done.

Read, therefore, in the light of the parol proof offered by the defendant at the trial, I think the giving of drilling directions by the defendant was a condition precedent to be performed by the defendant before plaintiff could proceed with the proper execution of its contract, and that the neglect and final refusal of the defendant to give drilling directions was, of itself, a breach of the contract on the part of the defendant which excused the plaintiff from the actual manufacture of the rails and the actual tender of them to the defendant. I think the testimony in the case fully justifies the conclusion that defendant's neglect and refusal to furnish drilling directions was for the mere purpose of delay, and that from early in the month of May defendant did not intend to fulfill this contract. Not only had there been a large decline in the price of steel rails upon the market, but the defendant had failed to make satisfactory financial arrangements to enable him to pay for the rails. For a time, therefore, he asked and obtained from the plaintiff a delay and postponement of the time of delivery; but, finally, when pressed by plaintiff to give the directions for drilling and to take the rails, he frankly told the agents of plaintiff that he could not pay for the rails, and would not receive them. This statement by defendant, that he would not perform the contract by accepting and paying for the rails, was also a breach of the contract by defendant, and entitled plaintiff to damages.

The only question in the case, therefore, as it seems to me, is what damage the plaintiff has sustained by reason of defendant's breach of this contract.

The rule in awarding damages in cases of this character for a breach of contract is to make the plaintiff as nearly whole as he can be made in money damages; or, in other words, as nearly as possible leave him as well off as he would have been if the defendant had performed his contract. Here was a manufacturing corporation, with expensive machinery and plant, and compelled, from the nature of its business, to invest large sums of money in iron ore, pig iron, spiegel, coke, and other material, and in labor, for the purpose of performing this contract. The proof shows that the plaintiff, on making this contract in good faith, purchased the material necessary to fulfill it. The proof as to the cost of these rails to plaintiff rests on the testimony of two witnesses,—H. P. Smith, the manager of plaintiff's mill, and Richard C. Hanna, secretary of the North Chicago Rolling Mill Company. Mr. Smith states that the cost of manufacturing the rails in question, at plaintiff's mill in Pittsburgh, was $45.12 per ton, and that the freight on them to Chicago, where they were to be delivered to plaintiff, was three dollars per ton, making the total cost of manufacturing and delivering

the rails to defendant, under the terms of this contract, $48.12 per ton; while Mr. Hanna states that it cost his company $50 per ton to make such rails in Chicago, and that from information he had derived from his experience in the business plaintiff could make the steel rails called for by this contract in its mill at Pittsburgh, and deliver them in Chicago, at just about what it cost the North Chicago Rolling Mills Company to make them here. Mr. Hanna has no interest in the event of this suit, is not connected with either party, and I conclude that his testimony as to the cost of these rails here is the most reliable, and that it would, in fact, have cost the plaintiff $50 per ton to have made these rails and delivered them to the defendant, in accordance with the terms of this contract. The proof also shows that steel rails declined rapidly from about the time this contract was made, so that during the months of August and September they were not worth as much by from $10 to $12 per ton as the contract called for. The proof, however, further shows that after the plaintiff was informed that defendant would not take and pay for the rails at the time called for by his contract, the plaintiff sold to a railroad company in Michigan 4,000 tons of steel rails, which were manufactured out of the material provided for the fulfillment of this contract with the defendant, for which plaintiff received $54.60 per ton, delivered at a point on Lake Huron. These were 35-pound rails, and it cost the plaintiff $49 per ton, as the proof shows, to manufacture them, and $4 per ton to transport them, leaving a profit of $1.60 per ton to plaintiff, and this profit should be deducted from the difference between the contract price with the defendant and the cost of making the rails under the defendant's contract; that is to say, the difference between the cost of the rails in Chicago to the plaintiff and the contract price is eight dollars per ton, which on the 6,000 would amount to $48,000. From this should be deducted the profit of $1.60 per ton on the 4,000 tons of rails sold in Michigan, amounting to $6,400, leaving $42,400 as the loss to which plaintiff has been subjected by this breach of defendant's contract; and it seems to me, in the light of well-settled authorities, that this should be and is the true measure of plaintiff's damages.

In the case of the *Philadelphia, W. & B. R. Co.* v. *Howard*, 13 How. 307, where the opinion was delivered by Mr. Justice CURTIS, it is said:

"But it by no means follows that profits are not to be allowed, understanding as we must the term 'profits' in this instruction as meaning the gain which the plaintiff would have made if he had been permitted to complete his contract. Actual damages clearly include the direct and actual loss which the plaintiff sustained, *propter rem ipsam non habitare.* In case of a contract like this, that loss is, among other things, the difference between the cost of doing the work and the price to be paid for it. This difference is the inducement and real consideration which causes the contractor to enter into his contract. For that, he spends his time, exerts his skill, uses his capital, and as-

sumes the risks which attend the enterprise; and to deprive him of it when the other party has broken the contract and unlawfully put an end to the work, would be unjust. There is no rule of law which requires us to inflict this injustice. Wherever profits are spoken of as not a subject-matter of damages, it will be found that something contingent upon future bargains or speculations or states of the markets are referred to, and not the difference between the agreed price of something contracted for, and its ascertainable value or cost. We hold it to be a clear rule that the gains or profit, of which the contractor was deprived by the refusal of the company to allow him to proceed with and complete his work, was a proper subject of damages."

And the same rule is announced in the late work of Sutherland, Dam. vol. 1, p. 117, where it is said:

"Where a party has attempted to perform labor from which a profit is to spring as a direct result of the work done at the contract price, and he is prevented from earning this profit by the refusal to act of another party, the loss of this profit is the direct and natural result which the law will assume to be the breach of the contract, and he is entitled to recover it, with proper damages; and this he will be entitled to establish by showing how much less than the contract price it will cost to do the work or perform the contract."

And the conclusion just stated by Mr. Sutherland is supported by the citation of numerous recent cases. And in *Masterton* v. *Mayor, etc., of the City of Brooklyn,* 7 Hill, 61, the same rule was adopted. So, too, in *U. S.* v. *Speed,* 8 Wall. 77, the court said, by Mr. Justice MILLER:

"And we do not believe that any safer rule, or one nearer to that supported by the general current of authority, can be found than that adopted by the court, to-wit: The difference between the cost of doing the work and what the claimant was to receive for it, making reasonable deduction for the loss of time engaged, and for release from the care, trouble, risk, and responsibility attending a full execution of the contract."

The proof in this case abundantly shows that the plaintiff could not have manufactured its material into rails and sold those rails upon the market without sustaining a greater loss than the difference between the price called for by this contract and the cost of making the rails; in other words, if the plaintiff had manufactured the rails in pursuance of this contract, and, on defendant's refusal to receive them, had put them upon the market and sold them at the current market price, the loss to the plaintiff would have been greater than the amount of damages I have arrived at by the rule adopted.

There is, therefore, no allowance or deduction to be made in this case for a "release from the care, trouble, risk, and responsibility attending a full execution of the contract," because the plaintiff was obliged to go upon the general market to find a new customer for its goods, and sell them at a lower price than the difference between the cost of manufacturing and the contract price, instead of receiving the profit which the contract with the defendant entitled it to. The risk, care, and trouble, therefore, devolved upon plaintiff by reason

of the breach of the contract, rather than any which would have followed its performance.

I must, therefore, find the issues for the plaintiff, and assess the damages at $42,400.