INSLEY and others *v.* SHEPARD and others.

*(Circuit Court, N. D. Illinois.* July 28. 1887.)

1. BRIDGES—MAINTENANCE OF—PETITION TO ROAD SUPERVISOR—REQUISITES OF.
   Under Illinois act of March 28, 1883, which amends the act of May 28, 1879, § 107, authorizing the maintaining of bridges over streams near town-lines by the two towns interested, at their joint expense, and authorizing one of the two towns interested in such bridge to build the same at its own expense if the other town refuses to join in the building. it is not requisite that the petition (which, by said amending act, is required to be presented to the road supervisor as a preliminary to the call of a town meeting by him to pass upon the proposition as to whether this town shall build at its own expense) shall request that the question of borrowing money to buy or build the bridge be submitted to the meeting. but it is sufficient if it merely request that a meeting be called to vote on the question of building or not building a bridge, and it is for the supervisor, if necessary, to include a proposition as to borrowing in his call.

2. SAME—LOCATION OF BRIDGE—HIGHWAY COMMISSIONERS.
   Section 106 of the above act, which authorizes the building of bridges over streams near county or town lines, will be held to give the highway commissioners of the town or towns electing to build such a bridge power to determine its location, within a mile or any other reasonable distance from the town-line.

3. SAME—ADVERTISING FOR BIDS—CHANGE IN LOCATION.
   Where the commissioners of highways, in accordance with the above act. advertised for bids, and have received bids giving separate estimates on the material and the different kinds of work required in the construction, and have accepted one of such bids, with the understanding that, when the location is fixed, the amount to be paid will be determined by the length of the bridge, upon the basis fixed by the bid, they are not required, when they have located the bridge, to advertise again for fresh bids, though the location fixed upon may require a shorter bridge than that contemplated by the accepted bid.

4. DAMAGES—BREACH OF CONTRACT.
   In awarding damages to a bridge-builder for the breach of a contract entered into with him for the construction of a bridge over a river, the measure of damages will be held to be the difference between the contract price and the cost of doing the work, less a reasonable deduction for the less time engaged in the work, and for the release from the care, trouble, risk, and responsibility attending a full execution of the contract, which, in a case where the contractor has made no allowance for contingencies in estimating his profits, may be reckoned at 30 per cent. of the theoretical profits. Cash paid to subcontractors will be added as damages; but no damages can be claimed for loss sustained in adapting material purchased to use in other bridges, nor for the construction of patterns, nor for plaintiff's expenses in obtaining the contract.

*E. F. Bull,* for plaintiffs.
*Geo. B. Foster,* for defendants.

BLODGETT, J. On September 13, 1883, a contract was made between the plaintiffs and the town of Peoria, by the highway commissioners of said town, by which plaintiffs agreed to construct a bridge across the Illinois river at a point known as "Partridge's Crossing," or the "Narrows," according to certain plans and specifications referred to in, and made a part of, the contract, for which the town agreed to pay the plaintiffs the sum of $51,800, payable in monthly estimates as the work was per-

formed and the material was delivered. Plaintiffs soon after entered upon the performance of the work, and had spent during the first month about $800, for which an estimate was asked, but defendant refused to pay, and in substance gave plaintiffs notice that the contract would not be performed by the defendants nor the town; and this suit is brought to recover damages sustained by plaintiffs by reason of the breach of this contract. A plea of the general issue was filed, with a stipulation that any facts constituting a defense in the case might be put in evidence under this plea.

The controlling facts, as they appear from the proof, are as follows:

The Illinois river forms the eastern boundary between the town of Peoria, in Peoria county, and the town of Fond du Lac, in Tazewell county, in this state; and in the spring of 1883 an effort was made by the commissioners of highways of Peoria to have the commissioners of highways of the two towns join in the building and maintenance of a free bridge across the river. The commissioners of Fond du Lac refused to bear any part of the expense of the proposed bridge, whereupon a petition was presented to the supervisor of the town of Peoria to call a special town meeting to vote upon the proposition whether that town would proceed to build and maintain such bridge at its own expense, pursuant to the provisions of the act of March 28, 1883, amending section 107 of the act in regard to "Roads and Bridges," approved May 28, 1879. On the filing of this petition, the supervisors directed the town clerk to give notice of a special town meeting to be held on the twenty-sixth of June, 1883, to vote for or against the proposition to buy or build a free bridge across the Illinois river, and to borrow money, not to exceed $70,000, to purchase or construct the same. The notice so ordered was duly published, and a special town meeting was held, and voted by a large majority in favor of buying or building such bridge, and to borrow not to exceed $70,000 for that purpose. The commissioners thereupon caused notice to be published soliciting bids for the construction of a bridge "across the Illinois river, opposite Peoria." A large number of bids were submitted by various bridge-builders, among whom were the plaintiffs; and the bid of the plaintiffs was accepted, at the price of $86,850.

The river, opposite Peoria, widens out into what is known as "Peoria Lake;" but about a mile above the north line of the township the stream becomes very much narrower. The plans and specifications of the proposed bridge contemplated a draw-span 295 feet long, turning upon a draw-pier, and two fixed truss spans of 150 feet each, and about 3,450 feet of wooden trestle-work. At the time the plaintiffs' proposal was received and accepted, the location of the bridge had not been fixed, and, as the cost of the bridge depended upon the width of the river or lake at the point where it should be built, the written contract with plaintiffs was delayed until the location was finally fixed at what is known as "Partridge's Crossing," or the "Narrows," a point about a mile north of the north line of the town, where the stream is quite narrow as compared with any point along the east boundary of the town. The west end of the bridge is in the town of Richwoods, and the bridge was only acces-

sible to Peoria by about 2½ miles of road within the territory of the town of Richwoods. On locating the bridge at this point, the written contract now in suit was made and signed. No new bids were solicited for the bridge at the "Narrows," and the reduction of the contract price from $86,-850 to $51,800 seems to have been mainly secured by reducing the wooden trestle-work from over 3,400 feet to about 500 feet; the bid showing the price for each class of work—that is to say, for the piers, draw-span, truss-spans, and wooden trestle-work. Before locating the bridge, or at the time of so locating it, the commissioners acquired the right of way for a public road to the river from the highway known as the "Old Galena Road," running from Peoria northward; and there was a road upon the east side of the river which furnished access to the bridge from the east.

The defenses interposed are: (1) That the petition for the special town meeting did not ask to have the question of borrowing money to buy or build the bridge submitted to such meeting; (2) that the bridge to be built under the contract was located outside of the boundaries of the town; (3) that the contract in question was let without advertising for bids, as required by the statute.

As to the first point, the only matter required to be contained in the petition asking the supervisor to call a special town meeting is a request for a vote on the proposition as to whether the town will proceed to build and maintain the proposed bridge at its own expense, when the other town has refused to join in such construction and maintenance. The town of Fond du Lac had declined to join Peoria in building and maintaining the proposed bridge; and the question then under the law was whether Peoria would do it alone; and this required the calling of a special town meeting for action on that question. The petition was signed by the commissioners of highway and more than 25 freeholders of the town, and was sufficient under the one hundred and seventh section, as amended, to authorize the call of the meeting. The supervisor must be presumed to know the financial condition of his town, and if it required funds to be borrowed for the enterprise, it was for him to include that proposition in the call for the meeting, as well as the proposition for his town to build the bridge at its own expense. The notice which the supervisor ordered the town clerk to publish, and which was duly published, called for a vote on two propositions: *First*, whether the town of Peoria would build and maintain the bridge at its own expense; and, *second*, whether it would borrow not to exceed $70,000 for that purpose. This notice brought all these questions properly before the town meeting, and the meeting decided in favor of both propositions by a vote of over two to one, as shown by the records of the town in evidence.

As to the second proposition, that the bridge was built outside of the boundaries of the town. Section 106 of the act of May 28, 1879, authorizes the maintaining of bridges over streams near town-lines by the two towns interested, at their joint expense; and the act of March 29, 1883, amending section 107 of the act of 1879, authorizes one of the towns interested in such bridge to build the same at its own expense, if

the other town refuses to join in the building. The words "near county or town lines," in section 106, clearly clothes the authorities—that is, the commissioners of highways of the two towns, if they unite in building a bridge, or of the town which decides to build it at its own expense—with the power to determine the location. They are to say, in the exercise of the discretion vested in them under the law, where the bridge shall be built, whether it shall be upon the town-line, or near it; and no other tribunal can review or revise their decision. True, there might be a location fixed that would so palpably violate the true meaning of the word "near" as to justify the court in holding that the town authorities had exceeded their powers and authority; but within any reasonable bounds the location fixed by the town authorities would be conclusive. The word "near," as used in this statute, is a relative term, and depends upon the circumstances and peculiar surroundings in each case; and those circumstances the court will presume were duly considered by the commissioners of highways before they decided upon the location. If a bridge could not be built upon the town-line without great expense, and by going half a mile or a mile, or any other reasonable distance, from the town-line, an eligible and much cheaper location could be found so as, in the judgment of the commissioners, to equally accommodate the public, no doubt the action of the town authorities is binding and conclusive. In this case it seems quite evident to me that the highway commissioners of the town did not exceed their powers.

As to the last point, the act of June 23, 1883, in force at the time this contract was made, requires the commissioners of highways to give at least 10 days' notice of the letting of all contracts for the construction and repair of roads and bridges where the amount to be expended exceeds $75. In this case the commissioners advertised for bids for the building of a bridge across the Illinois river, opposite Peoria, stating the class and kind of work. At that time the location of the bridge was not fixed. Plaintiffs put in a bid for certain kinds of bridge-work, draw-piers, trussed draw-spans, fixed truss spans, and trestle-work. Their bid was accepted, with the understanding that, when the location was decided, the amount to be paid for the work would be determined by the length of the bridge, upon the basis fixed by the bid. The bridge contracted for was the same kind of bridge as that bid for, with some slight modifications as to the style of the truss and the piers, and a great diminution in the amount of wooden trestle-work for the approaches to the bridge. I do not think, upon these facts, a new advertisement was necessary after the location had been decided upon. The object in advertising for bids upon the work is to ascertain and obtain the views of builders as to the cost of such work; and when that fact is determined, and the competition has been invited, and the competing bidders have made their offers, the town authorities may properly accept such bid as they deem best under all the circumstances, and, in the contract for the work, make such modifications from the plans and specifications as seem desirable, where there is no radical departure from the proposition; and here, it seems to me, there was no such departure.

It therefore seems to me that none of the defenses interposed in this case are available to defeat the plaintiffs' action, and the plaintiffs are entitled to recover the damages they have sustained by the breach of their contract.

The plaintiffs have submitted proofs in regard to various elements of damage, as follows: (1) Proof that the cost of constructing the bridge according to the plans and specifications in the contract would be $35,-206, which, deducted from the contract price, would leave a profit of $15,-594; (2) that plaintiffs purchased a portion of the material for this bridge before the contract was repudiated by the defendants, on which they sustained a loss of $2,500 in adapting such material to other uses; (3) cost of patterns made specially for this work, $370; (4) cash paid to subcontractors for work on pier, $824; (5) expenses of plaintiffs' agents in traveling to and from Peoria, making plans and specifications, telegrams, etc., about $2,145.

In *Masterton* v. *Brooklyn*, 7 Hill, 61, the supreme court of New York held that the profits and advantages which are the direct and immediate fruits of a contract entered into between the contracting parties may be awarded as damages against the party who has violated the contract; and this case was followed by the supreme court of the United States in *U. S.* v. *Speed*, 8 Wall. 77, and *U. S.* v. *Behan*, 110 U. S. 338, 4 Sup. Ct. Rep. 81. In the *Speed Case* the court said:

"We do not believe that any safer rule, or one nearer to that supported by the general current of authorities, can be found, than that adopted by the court, to-wit: The difference between the cost of doing the work, and what the claimants were to receive for it, making a reasonable deduction for the less time engaged, and for the release from the care, trouble, risk, and responsibility attending a full execution of the contract."

The plaintiffs' proof as to the amount of profits which they would have made by the performance of the work is not disputed, or in any way contradicted, by the defendants; but the court must assume that there should be a reasonable deduction from this theoretical amount of profit for a "release from care, trouble, risk, and responsibility attending a full execution of the contract." The execution of the contract in question involved considerable risk. The piers which were to be erected by the contractors might have been washed out by a freshet in the river; a span, or some portion of their trestle-work might have been destroyed by high water; there might have been delays by bad weather, or inability to procure material, to such an extent as to have very materially reduced the theoretical profits upon this contract. The figures of the plaintiffs' witnesses are based on the assumption that there would be no drawbacks nor losses in the execution of the contract, when every practical man knows that losses and delays are as a rule encountered in almost every contract like this. Hence I have concluded to take 30 per cent. from the theoretical profits which the plaintiffs' proofs show they would have made by executing this contract, for those unforeseen contingencies which would almost inevitably attend the performance of such a work, making $10,916.

The cash paid the subcontractors, $834, is a proper element of plaintiffs' damage; but I do not think the proof justifies me in sustaining the item for $2,500 for loss on materials purchased. The plaintiffs were bridge-builders, and there is no proof in the case showing, or tending to show, that this bridge was so different from other truss-bridges and draw-bridges, that so large a loss would be sustained in adapting the material purchased to use in other bridges. The item for the construction of patterns is also disallowed, for I cannot conceive that such patterns could be entirely useless in the business of the plaintiffs; and so also as to the large claim for expenses of plaintiffs in obtaining this contract, submitting their plans and specifications, telegraphing, traveling expenses, etc.

This leaves the plaintiffs' damages $11,750, for which judgment will be entered.