# THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY

## V.

## EDWARD S. RICHARDS, SURVIVOR, ETC.

*Contracts—To Weigh and Transfer Grain—Breach—Abandonment—Damages—Evidence—Interest—Future Profits.*

1.   The conduct which will justify a party in abandoning a contract and entitle him to recover, not only for the work he has done, but for the profits he can prove he would have made had the contract gone on, must be such as in effect prevents the performance of the contract; the acts for which the abandonment is made must be such as indicate an intention not to fulfil, and such as affect the very substance of the contract; and further, it should appear that such acts are deliberately done, and are not the result of something inadvertently overlooked.   Speculative and fanciful profits can not be recovered, but profits which it is proven the party would have made, are in such case recoverable.

2.   No weight can be given to the declaration of a party to a contract, that he always has carried and intends to carry out the terms thereof, he at the same time insisting that he means to continue to do what the Supreme Court of the State has declared with reference thereto, that he had no right to do.

3.   The contract itself, the words and acts of the parties and the circumstances of the situation must all be considered in determining whether the conduct of a given party was such as amounted to so substantial a breach of the contract, and refusal to perform, as justified the other party thereto in abandoning the same, and warrants the recovery of profits that would have been made had the contract been carried out.

4.   In cases of this kind, where profits or wages are awarded by judgment of court, long before the time at which they would, had the contract gone on, been earned, an abatement for interest should be made.

5. The rights of parties under contracts can not, as a rule, depend upon their pecuniary condition.

6. The failure which will justify a party in abandoning a contract and at the same time enable him to recover for future profits, must go to the very substance of the contract and must, in effect, prevent the party who abandons from going on with it.

7. In an action brought to recover the profits which parties named would have made if defendant had not so failed and refused to comply with its contract, touching the ascertaining by them of the weight of grain passing over its road, and the transfer of the same from car to car, they contending that such failure amounted to a total failure or breach of the contract, so that they were, by its acts, prevented from fulfilling the contract upon their part, this court holds that the question whether they were men of large or small means can not be considered; that the fact of a recovery in another litigation of damages for the principal portions of the breaches for which the contract was abandoned, cuts no figure in the case presented, and declines, in view of the evidence, to interfere with the verdict against the defendant.

[Opinion filed June 2, 1891.]

Appeal from the Circuit Court of Cook County; the Hon. Julius S. Grinnell, Judge, presiding.

Messrs. John N. Jewett and Pliny B. Smith, for appellant.

It was argued by counsel for Richards, that a case of repudiation of the contract with the railway company could be predicated upon intentions of the railway company in respect to the performance of the contract, and the evidence of such intention, principally relied upon, has been the letter of the attorney of the railway company, written in reply to letters of Richards, Maynard & Co., set out in the record, in which it is stated, as matter of opinion, that the railway company "is not bound to deliver grain to Richards for transfer, except at its option," and cases have been cited, holding that where a party, before the time for performance arrives, announces his intention not to perform, the other may at once maintain an action for a total breach of the contract, a rule of law well recognized, but having no application here.

The letter referred to expressed simply the attorney's opinion of the law of the contract. It contained no expression of intention on behalf of the railway company not to per-

form.   The letter referred to is set out in full in abstract, pages 189 to 193, and contains no statement or suggestion that the railway company repudiated or refused to perform the contract, or any expression of an intention in the future not to deliver all grain to Richards, Maynard & Co., for transfer, in pursuance of the terms of the contract.   The letter gives no intimation of a purpose on the part of the railway company to abrogate the contract.   The questions discussed in the letter relate solely to the claims then being made upon the railway company by Richards, Maynard & Co., and indicate simply the opinion of the attorney in respect to those claims.

An expression of opinion by one party as to the legal bearing of a contract, unconnected with any expression of intended action regarding the same, can not justify the other party in acting upon that opinion, as a repudiation or abandonment of the contract itself.   New Albany, etc., R. R. Co. v. Fields, 10 Ind. 187–190 ; Starr v. Bennett, 5 Hill, 303.

The letter not only expressed no intention or purpose of the railway company to abandon the contract, but the evidence in this case shows that the railway company continued to deliver grain at the transfer house of Richards, Maynard & Co. down to the time when the firm closed its house and refused to receive any more grain for transfer.

Future profits are not recoverable as damages for breach of an agreement, unless the aggrieved party has a contract by which the amount of work to be done was definitely fixed. Frazer v. Smith, 60 Ill. 145; Homer v. Wood, 16 Barbour, 386; Olmstead v. Burke, 25 Ill. 86; Hill v. Parsons, 110 Ill. 107.

The only claim which is made in this case, is for the recovery of future profits (by way of damages), which, it is claimed, would have resulted to Richards, Maynard & Co., or to Richards, as the survivor of that firm, if they on their part had fully executed their contract to the end of the term specified therein.   In this statement there is excluded the claim, apparently made, for the value of the transfer house and equipments, which can not, by any possibility, be considered by the court.

Appellee could not, in any event, recover the amount invested in the building.

This is clearly established in T., W. & W. Ry. Co. v. J. D. B. Co., 63 Ill. 308.

There the railway company made a contract with the building company, in October, 1886, by which it leased to the latter a portion of its depot grounds in Jacksonville, for the construction of a passenger depot and eating house, which the lessee undertook to erect. The railway company agreed to occupy a certain portion of the building as passenger rooms, etc., and to pay rent equal to ten per cent of the cost of the part so occupied; it was also to stop all passenger trains twenty minutes for meals.

The building company was to lease that portion to be occupied for an eating house, only to such tenants as should be approved by the superintendent of the railway company. The lease to the building company was for five years after the building was completed, and any time after the five years, the railway company was to have the right to purchase the building at cost, on giving six months notice. The building was completed at a cost of about $28,000, the railway company took possession of the allotted rooms, and the eating house was rented with the consent of the company, the tenants remaining two years, but failing to pay the rent. The building company applied to the superintendent of the railway company for its consent to a change of tenants, which was refused. The building company compelled the tenants to leave, and leased to a new tenant, without the consent of the railway company's superintendent. At the end of two months part of the passenger trains ceased to stop for meals; soon after, all ceased but one. The tenant then left the building. The building company ceased to occupy any part of the building, and, in a suit to recover the value of the building from the railway company, judgment for $28,650.64 was rendered. The court said (p. 310):

" We are very clearly of the opinion that the appellant had no right, under a just interpretation of this contract, to compel the appellee to retain a tenant who refused to pay his rent.

It follows they were in the wrong in ceasing to stop their trains for meals, if the new tenant kept a house to which no reasonable objection could be made.   *   *   *   The position of plaintiff's counsel is that in consequence of the wrongful act of the defendants, the plaintiff had a right to treat the contract as rescinded, and to recover not only the damages accruing from the loss of rent, but the entire value of the building.  The Circuit Court so held, and in this we think there was error.   *   *   *   The difficulty in the present case is that the labor and materials which went into the construction of this building have not become the property of this defendant, and there never was an agreement that they should become its property.  The building was erected on land which, by virtue of the lease, belonged to the plaintiff for the term of five years.   *   *   *   There is nothing here upon which the law can raise an implied contract.  To do so would be to compel the defendant to purchase property which it never undertook to purchase.  Admitting it has violated its covenants, still we have no right to compel it to buy this property as a penalty. *   *   *   The covenants into which the defendant entered, though undoubtedly the inducements for the plaintiff to build, were, nevertheless, not covenants, the performance of which would effect a purchase of the building."

That authority is conclusive against the claim for the value of the transfer house.

Mr. W. A. GARDNER and A. M. PENCE, for appellee.

1.   Total abandonment of a contract may be from an actual failure to go on with a contract on the part of one of the parties, when the other party is ready and willing to perform his part, as in the case of United States against Behan, 110 N. S. 338, Masterson v. The Mayor, etc., 7 Hill, 61, and that class of cases.  In such cases there is no doubt expressed by counsel for appellant that future profits may be recovered.

2.   Total abandonment of a contract may be taken from the announcement by one of the parties to it, that he will not be bound by its terms, as in Hochster v. De Latour, 6 Eng. L. and Eq. 157; Withers v. Reynolds, 2 B. and A. D.

882; Fox v. Kitton, 19 Ill. 519; Kadish v. Young, 108 Ill. 170. In those cases it is held that a party to a contract which is thus broken, need not wait till time for performance has arrived, but may take the party announcing that he will not be bound by it, at his word, and bring suit at once to recover his damages.

3. A contract may also be totally abandoned by the failure of one of the parties to it to perform it according to its terms, in such a way as to evince an intention not to be further bound by its terms, or by one of the parties insisting upon performing it in such a way as would make it different in substance from the intention of the parties as expressed by their contract. Withers v. Reynolds, 2 B. & Ad. 882; Leopold v. Salkey, 89 Ill. 422.

"A man who wilfully places the property of another in a situation where it can not be recovered, or its true amount or value ascertained, by mixing it with his own, or in any other manner, will consequently be compelled to bear the inconvenience of the uncertainty or confusion which he has produced, even to the extent of surrendering the whole, if his share can not be distinguished, or responding in damages at the highest value at which the property in question can be reasonably estimated." Lupton v. White, 15 Ves. 432; Hart v. Ten Eyck, 2 Johns. Ch. 62, 80; Ryder v. Hathaway, 21 Pick. 298; Clark v. Miller, 4 Wend. 628; Bailey v. Shaw, 24 N. H. 297; Harris v. Rosenberg, 43 Conn. 232; Smith's Leading Cases, note.

"This rule will be applied with utmost strictness where the wrong is coupled with or consists in a breach of an express trust or confidence." Lupton v. White, 15 Ves. 432; Hart v. Ten Eyck, *supra.*

In the case at bar the above rule should be applied with the utmost strictness, for the breach of the contract consisted in the most shameful breach of an express confidence that the company would not make use of Richards' weights for any purpose but "billing property to destination," yet it sold Richards' weights to the western roads and made it impossible to estimate how many customers Richards might have

gotten among the western shippers. Taking the manner in which this company usurped everything that Richards had a right to expect to flow to him, and shameful switching facilities it foisted upon him, together with the failure to furnish all the cars it should have done, and preventing him in every way from getting a compensation for doing through business, delivering reconsigned grain as through grain, furnishing through grain to him to weigh and transfer to the exclusion of grain of his customers, and demanding that its outrageous switching charges be taken in estimating the cost of transfer, and deducting the excess in such cost from the amounts to be paid over to Richards, which it had collected for account of Richards' weights, which excess was brought about by its failure to furnish proper switching facilities, let alone its other acts of tyranny and oppression, and we have a case where the above rule should be applied with ultra utmost strictness.

WATERMAN, J. On the 2d of January, 1884, the parties to this suit, the railroad company as the party of the first part, and Richards as the party of the second part, entered into a contract, by which it was provided that Richards should erect a transfer house, and suitably equip and keep it so as to be at all times ready to weigh in hopper scales and transfer from car to car, all grain that might be sent to it by the railroad company.

The contract further provided, that while it was understood that under no circumstances was said first party to be charged for any weights upon any transfers made through Richards' transfer house, nothing in the agreement should be construed as preventing the said second party from charging such fees as might be agreed upon between him and the owner of the property delivered, for weights and transfers and for such other service as he might render in connection therewith.

And it further provided that the party of the first part should not make use of the weights obtained from said second party in the conduct of its business for any other purpose than billing the property to its destination, but upon the request

of the said second party, would collect such weighing charges as the said Richards might show were due to him, in the same manner as other charges were collected by said party of the first part, and should pay the same to said Richards on or before the middle of each and every month.

It was claimed upon the trial that Richards' method for transferring grain from car to car and weighing the same in hopper scales, thereby obtaining exact weights, was a very great improvement over the old method of weighing the grain in the car, because much more exact. And upon the trial it further appeared that the exact weight and amount of the grain in cars, received and transferred through Richards' warehouse, was valuable information to various persons engaged in the grain business in Chicago and elsewhere, and that such exact weight had a regular market value of about seventy cents per car. Richards assigned his contract to Richards, Maynard & Co.

Very soon after the formation of this contract, and the construction of the transfer house contemplated by it, differences arose between the parties which finally resulted in a suit brought June 5, 1886, by Richards against the railroad company for an accounting, the decree in which suit being appealed from, it came before the Supreme Court of this State, and in the 126th Illinois, page 448, the case of the Lake Shore & Michigan Southern Railway Company against Richards, several of the provisions of this contract are commented upon and construed by the Supreme Court, and must, therefore, be accepted in this case as the true meaning of such provisions.

As the contract contained an agreement that in case differences arose between the parties thereto as to its spirit, meaning or execution, such differences should be settled by a reference of all matters in dispute to three arbitrators, the parties of the second part wrote to the president of the railroad asking that the matters and differences be submitted to arbitration, to which he, on the 17th of April, 1886, replied that the railroad company having at all times faithfully performed its obligations under the contract, he did not consider that there were any matters calling for arbitration.

On the 27th of April, Richards & Co. made a specific statement of claims against the railroad company, dividing the same into eight heads, to which, on the 13th of May, 1886, the railroad company, by its attorney, replied as to claim three—"For weights used for other purposes than billing to destination"—that the claim did not show for what purpose it was claimed such weights were had, or how the number of cars on which it is claimed such weights were given is arrived at; the claim was therefore disallowed, and the railroad company also insisted that the company was not bound under its contract to deliver grain to Richards except at its option.

This led to a correspondence, in which, on the 11th of June, 1886, Richards, Maynard & Co. wrote to the road that its policy of cutting off the cash receipts of their business, as it had done despite their protest, left them no other alternative than to close their house and suspend work; and further notified the road that unless their claims for cash advances for operating expenses, amounting to $2,592.25, to May 1, 1886, and their account for May, 1886, amounting to $646.85, was adjusted and paid by June 16th they would be compelled to suspend operations pending an adjustment of differences. To this the railroad company on June 16th, replied in effect, that they should not change the position taken by them theretofore, and that if Richards, Maynard & Co. closed their house it would be in violation of the contract. In accordance with their letter, on the 16th of June, 1886, Richards, Maynard & Co., closed their house.

This suit is brought to recover the profits which it is claimed Richards, Maynard & Co. would have made if the railroad had not, as is alleged, so failed and refused to comply with their contract that it amounted to a total failure or breach of the contract, so that Richards, Maynard & Co. were by the acts of the railroads prevented from fulfilling the contract upon their part.

We do not regard the letter of Richards, Maynard & Co., dated June 11th, as a simple statement that they would close their transfer house unless the disputed account was recognized and paid. It may be that had the railroad company paid the

claims mentioned in said letter, Richards & Co. would have been estopped from closing their house for the other reasons alluded to in it.   But the letter was more than a mere demand for payment and a threat to close if such payment was not made.   It distinctly alluded to other matters and made complaint of a policy of the road, the effect of which, it insisted, was to cut off their cash receipts and leave them no other alternative than to close their house and suspend business.

It is quite true, as insisted by appellant, that a rescinded contract is dead.   But the position of appellant is not that they rescinded the contract, but because of the unwarranted acts of appellee, by which, as is alleged, it neglected and refused to perform the contract, appellant therefore ceased to make any further efforts on its part to comply with its undertaking.

We have no doubt that the conduct which will justify a party in abandoning a contract and entitle him to recover not only for the work he has done, but for the profits he can prove he would have made had the contract gone on, must be such as in effect prevents the performance of the contract; the acts for which the abandonment is made must be such as indicate an intention not to fulfil, and such as affect the very substance of the contract; moreover we think it should appear that such acts are deliberately done, and are not the result of something inadvertently overlooked.   Speculative and fanciful profits can not be recovered; but profits which it is proven the party would have made, are, in such a case, recoverable.   Masterton v. The Mayor, 7 Hill, 61; United States v. Speed, 75 U. S. 77–84; United States v. Behan, 110 U. S. 338–346; Freeth v. Burr, L. R.., 9 C. P. 208–213; Mersey Steel & Iron Co. v. Naylor et al., 9 L. R. Q. B. Div. 648–657; Ex parte Stapleton, L. R., 10 Chan. Div. 586–590; Palm & Robertson v. The Ohio & Miss. R. R. Co., 217–220; Leopold et al. v. Salkey, 89 Ill. 412–422; Sutherland on Damages, Vol. 1, p. 113, 117, 130.

It is said in Leopold v. Salkey, *supra:* " When the failure to perform the contract is in respect to matters which would render the performance of the rest a thing different in sub-

stance from what was contracted for, so far as we are advised, all agree the party not in default may abandon the contract."

The question, therefore, in this case is largely one of fact, viz.: Did the railway company refuse to comply with the substance of the contract? Was its failure and refusal such that in effect it prevented Richards, Maynard & Co. from completing the contract? Did the railway company by its acts clearly manifest an intention not to fulfill as to substance and material matters, the contract which it had entered into? Was the failure of the railroad to perform in respect to matters which would have rendered the going on under it a thing different in substance from what was contracted for?

It is established by former litigation between these parties. that the railroad company unjustifiably refused to fulfil its contract, and large damages have been awarded and paid to appellee therefor. But still the question remains, was such failure one of such substance, its nature and character such that thereby an intention not to fulfil the contract was manifested by its acts, and did such refusal go to the very essence of the contract?

It is quite true, as is contended by appellant, that a party is not responsible for an intention not carried into effect. The question, therefore, is not merely what the railroad company intended to do, but what it did, and what intention was manifested by its acts. And neither is the railroad company to be cast, simply because it may have made an illegitimate demand upon appellee. But such demand is an act to be taken into consideration in determining what the character of all it did, amounted to.

The jury were instructed that in order to enable the plaintiff below to recover it was necessary for him to establish, by a preponderance of evidence, that the firm of Richards, Maynard & Co. were, by the acts of the defendant, prevented from the performance of the contract on their part, or that the execution of the contract on their part was interrupted by, and as the legitimate consequence of the acts of the defendant in disregard of its obligations under the contract; and the jury were also instructed that if the defendant com-

mitted breaches of the contract, still if such breaches did not defeat the substantial objects of the contract or render it unattainable by proper performance on the part of the firm of Richards, Maynard & Co., then the plaintiff could not recover. Under these instructions the jury found for the plaintiff, and the question now presented is not whether this court would so have found upon the evidence, but whether it can be said that the evidence produced in the court below did not justify and will not sustain such finding. It is quite true, as is urged by appellant, that as a rule a mere failure to pay money due upon a contract will not justify the other party in abandoning the contract and enable him to recover the profits which he might have made had he gone on. Yet there may be contracts of such a nature that the failure to pay money from time to time or to supply business, as had been agreed, might be of the very substance of the contract and might absolutely prevent the other party from going on with it.

In this case the contract clearly provided that the railroad company was to use the weights obtained by it from Richards & Co., for no other purpose than billing the property to its destination. In violation of this, the railroad company proceeded to sell such weights for ten cents per car, thereby making a profit for itself and depriving Richards & Co. of the sum of seventy cents per car, which they might have received. And it has been found in a previous litigation between these parties that this was done in respect to more than twelve thousand cars, and appellee has been awarded a decree against the railroad company to the amount of over $8,000 therefor. The letter of the attorney of the road, written on the 13th of May, 1886, in which he replied to the claims of appellee, declared that the claim of appellee for weights used for other purposes than billing to destination, did not show for what purposes it is claimed such weights were used, nor how the number of cars on which it is claimed such weights were given, is arrived at. The claim was, therefore, disallowed. As the railroad company was well aware that it was selling such weights to its' customers, and had in its office a record of just the number of such weights it had

sold, such reply can not, in the face of the plain provision of the contract, be considered otherwise than as an expression of a determination not to carry out this contract in that regard. The president of the railroad company on the 17th of April, notwithstanding all it had done in respect to giving these weights away or selling them at ten cents per car, declared that the company had at all times performed its obligations under said contract, and therefore he did not think there were any matters calling for arbitration.

The same letter of the attorney of the company also declares that the company is not bound to deliver grain to Richards & Co. except at its option. It is manifest that if the company under the contract was bound to transfer through the house of appellee only such grain as it saw fit, then in respect to said contract, Richards, Maynard & Co. were completely at its mercy.

The substantial executory part of this contract at the time the transfer house was closed, was on the part of Richards, Maynard & Co., an obligation to be at all times in readiness to weigh and transfer with promptness and dispatch all products which might be delivered to them by or under the direction of the railroad. This necessarily involved the payment by them of current expenses for engineers, workmen, coal, etc., to a large amount, such expenses, it was claimed by them, amounting, for the month of May, 1886, to over $600.

The substantial executory obligations on the part of the railroad at this time were, first, that it should give to Richards, Maynard & Co., all the weighing and transferring of grain which it was in its power to give ; second, that it should not make use of the weights obtained by it from Richards, Maynard & Co. for any other purpose than billing the property to its destination.

Upon the keeping by the railroad company of these two obligations depended almost everything that was of use or value to Richards, Maynard & Co. in this contract. It had only such business as the railroad company gave it; it practically had compensation only by a sale of and charges for the weights made in such business.

For months previous to the closing of the transfer house the railroad company had claimed and exercised the right to give to Richards, Maynard & Co. for weight and transfer only such grain as it saw fit, and also claimed the right to, and did make use of weights for purposes other than billing the property to its destination, thus depriving Richards & Co. of the principal source of remuneration for work by them done. The situation was not that of a refusal by the railroad company to pay for work done for them, but rather a refusal to give the work it had covenanted it would give, and by an appropriation to its own purposes of the property of Richards & Co., preventing them from selling to others the fruits of their labors. It is perhaps the case, as is suggested, that before an abandonment of an executory contract because of a refusal to perform, there should be a *locus pœnitentiæ;* but it can not be said that in this case Richards, Maynard & Co. acted hastily; the correspondence was voluminous and the remonstrances long continued over these matters, ere they took their final step.

It is true that appellant did all the while declare that it always had and always would carry out the contract, but it at the same time declared that it meant to continue to do what the Supreme Court of this State have declared that it had no right to do.

The contract itself, the words and acts of the parties and the circumstances of the situation must all be considered in determining whether the conduct of appellant was such as amounted to so substantial a breach of the contract and refusal to perform as justified Richards, Maynard & Co. in abandoning, and warrants their recovery of profits they would have made had the contract been carried out.

The Supreme Court of this State having construed such contract and declared that under it Richards, Maynard & Co. were to have all the weighing and transferring which it was in the power of the company to give, it would hardly become this court, even if it were of such an opinion, to say that the contract was in that regard of such doubtful tenor that a persistent refusal to comply with it in that respect was not of a character which indicated an intention on the part of the railroad company not to be bound by the contract.

In a previous litigation between these parties the court has found that at various periods large amounts of grain and seeds were transferred and weighed by appellant by other methods than through plaintiff's house, and while the refusal to arbitrate differences was not a failure to comply with what, to justify an abandonment, can be considered as of the substance of the contract, yet such refusal is a fact to be considered with other things in determining whether the acts of appellant manifested an intention not to fulfil the substance of the contract.

And it seems to us that in view of these things this court would not be warranted in saying that the verdict of the jury is not sustained by the evidence, although the court is fully in accord with the position of appellant that the failure which will justify a party in abandoning a contract and at the same time enable him to recover for future profits, must go to the very substance of the contract, and must in effect prevent the party who abandons from going on with it. It is easy to be seen that if Richards & Co. had been men of large means they might, during the ten years which this contract had to run, have kept their house all the while ready to transfer any grain which might be given to them, as by the terms of the contract they were bound to do; but however great their means, they could not weigh and transfer all the grain which it was in the power of appellant to give them, as by the contract they were entitled, unless appellant gave them all such grain; this it refused to do, and if men of small means, it is obvious that to so keep their house ready to transfer on any day the hundred or more cars that were daily arriving, and yet have no certainty that any cars were to be given to them, and to be at the same time deprived of the opportunity to sell their weights, would in effect prevent them from fulfilling their contract. We do not think that in this case the question whether Richards, Maynard & Co. were men of large or small means, is to be considered. As a rule, the rights of parties under contracts can not depend upon their pecuniary condition. It seems to us that we can not say that the record fails to show that there was sufficient evidence to warrant the ver-

dict of the jury that by the acts of the railroad, Richards, Maynard & Co. were prevented from going on with their contract.

Nor do we think it material that appellee has recovered in another litigation damages for the principal portions of the breaches for which the contract was abandoned. Such damages were paid to him only at the end of protracted litigation, and such damages when received could not, in the very nature of things, have been of any assistance to Richards, Maynard & Co. in carrying out their contract a long time before. Certain letters commendatory of appellee's method of weighing and transferring grain were improperly received in evidence, but as such letters had no bearing upon the issues in this case, they can not, as we think, have had any influence upon the jury. Nor should evidence of the value of the transfer house have been admitted, because the theory of the plaintiff is that he is entitled to damages as if he had completed his contract, and if he had completed his contract, of course, at its termination, his transfer house would have been left upon his hands; and if it appeared that the value of said transfer house had been taken into consideration by the jury, we should not hesitate to set aside this judgment. But, so far as it appears, such value was not considered by the jury. In other words, there was evidence entirely outside of what was said about the value of the transfer house sufficient to make up the amount of damages awarded by the jury; damages on this account do not seem to have been claimed upon the trial below, as counsel for appellee distinctly stated to court and jury that there was nothing in the case but the claim for future profits, and the jury were instructed that the action was solely for such profits as might have accrued had the contract been fully executed. We think that in cases of this kind where profits or wages are awarded by judgment of court, long before the time at which they would, had the contract gone on, been earned, an abatement for interest should be made; but such abatement does not appear to have been claimed upon the trial below, and is not urged upon us.

The judgment of the court below is affirmed.

*Judgment affirmed.*