Peelle, J.,
delivered the opinion of the court:
Ity its contract with the defendants under date of May 18, 1897, the claimant entered into a covenant to “ furnish all the necessary materials, labor, machinery, and appliances, and reconstruct pier No. 4 of the Aqueduct Bridge, across the Potomac .River at Georgetown, D. C.,”in accordance with the specifications made part of said contract, at and for the aggregate consideration of $29,997.50, the work thereon to commence on or before May 30, 1897, and to be completed on or before November 1, 1897.
Pursuant to the terms of the contract, claimant on or about *734 June 1, 1897, assembled a plant adequate for the purpose and proceeded to the execution of the contract, first repairing the cofferdam and false work, upon which latter the bridge was suspended preparatory to the removal of the old pier. While that work was in progress the claimant also caused to be quarried and cut a part of the stone for the ashlar masonry. By the provisions of paragraph44of the specifications “thestone for all masonry other than concrete, coping, and bridge seats” was required to be “the best quality of hard and compact Potomac River gneiss, to be strong and durable and free from flaws, loose seams, cracks, or any other defects.” In consequence of the requirement of the specifications for stone of large dimensions, it was difficult to procure the same free .from such flaws and defects, and for that reason, in part, the work was prosecuted more slowly than would otherwise have been.
The claimant foreseeing that it would be impossible to complete the work within the time agreed upon, asked the engineer in charge for an extension of from ninety to one hundred and twenty days’ time, and after some correspondence between the parties, and to avoid the laying of masonry or concrete in freezing weather, the claimant was granted an extension by authority of the Chief of Engineers from November 1,1897, to June 1, 1898, subject, however, to paragraph 85 of the specifications, which provides, that “should the time for the completion of the contract be extended all expenses for inspection and superintendence during the period of the extension, the same to be determined by the engineer in charge, shall be deducted from payments due or to become due to the contractor,” of all which the claimant’s officers were notified, and two days later they acknowledged the receipt of such notice.
At that time, or a little prior thereto, the claimant had quarried and dressed about 45 per centof the total of cut stone required.
On November 1, 1897, in obedience to an order previously given by the engineer in charge, forbidding the claimant to proceed with any part of the work which would require the bridge to be suspended on false works during the winter months, all work of that kind was stopped. The suspension of work necessitated the lowering of the bridge from the false *735 work, and consequently prevented the claimant from proceeding- with any branch of the work except quarrying and cutting of stone, which latter work was continued during the winter months whenever the condition of the weather permitted.
On March 14, 1898, the condition of the weather and the river permitting, the claimant resumed work on the bridge, first suspending the same upon false work and testing it as required by the terms of the specifications preparatory to the removing of the old pier. On April 15 the claimant began the removal of the old pier and proceeded with that and the other necessary branches of the work until April 27. At that time the claimant had on hand, exclusive of work done on stone quarried but not yet completed, about 75 per cent of the stone required for the completion of the work, and which had been inspected by the Government officer, of which about one-fourth had been completed since March 1, 1898.
Prior thereto, on April 23, the engineer in charge of the work on behalf of the claimant had been requested to notify the claimant’s officers to hold themselves in readiness for an interview with the Government engineer in charge, to be held in Washington, to discuss terms for a temporary suspension of the work, which notice was transmitted to the claimants.
Thereafter, on April 28, on the application of the Government engineer in charge therefor, based on the possibilities of danger to traffic and travel over the bridge on account of the war with Spain, which the Congress, by the act April 25,1898 (30 Stat. L., 364), declared had existed since April 21, 1898, the Secretary of War authorized “the temporary suspension of the removal of the pier until the present crisis is over,” and directed the engineer in charge to confer with the contractor and to at once arrange accordingly. The engineer was further ‘: directed to block up the bridge at the pier and to make it as firm as possible for the great traffic to which it will be subjected daring the next few months.”
The claimant was duly notified of the order of suspension and the company was asked to bear the expenses incident to the suspension, which it declined to do, but offered to do the necessary work at cost plus 10 per cent if the defendants would *736 reimburse the company for its outlay, which they declined to do, and the work was then discontinued.
True, the general rule is that where one undertakes to do an entire work for a fixed sum, no recovery can be had unless the work be done; but this imposes upon the other contracting party the corresponding duty of doing- whatever may be necessary on his part to enable the contractor to perform his contract.
It is well settled that, for any improper intei'ference with the work of a contractor, the United States, like individuals, are liable. (United States v. Speed, 8 Wall., 77, 84; United States v. Smith, 94 U. S., 214, 217.)
Nor should the United States be held exempt from liability in this case by reason of the existence of war between them and the Kingdom of Spain at the time the work was suspended, though that was assigned as the cause, for the reason that while from patriotic motives every citizen, for the mutual good of all others, should be held to such reasonable sacrifice of personal interests as may be necessary for the public welfare, the rule should not be held to impose unjust or unequal burdens, nor do the facts and circumstances of this case require it, even though the claimant company may have undertaken a losing contract, from the performance of which it would rather have been relieved.
Had the work not been discontinued the claimant, who was willing to continue to perform the contract, would have been able to complete the work within the time provided. Against the order suspending the work the claimant protested and elected to treat the suspension as absolving it from any further performance of the contract, and notified the defendants that it would look to them “for full payment for all expenses theretofore incurred, profits prevented, and damages arising out of the breach of the contract by the United States.”
The order of the Secretary of War temporarily suspending the work “ until the present crisis is over,” necessarily operated to indefinitely suspend the further prosecution of the work, and thereby prevented the claimant company from the performance of the contract, against which its officers protested. The claimant company therefore had the right to *737 treat the contract as at an end and to seek damages for their outlay, as well as for anticipated profits under the ruling in the case of United States v. Behan (110 U. S., 338, 345), where a similar breach of contract was under consideration and the court laid down the rule thus:
“When a party injured by the stoppage of a contract elects to rescind it, then, it is true, he can not recover any damages for a breach of the contract, either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a quantum meruit. There is, then, no question of losses or profits. But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, including a fair allow-' anee for his own time and services. If he chooses to go further, and claims for the loss of anticipated profits, he may do so, subject to the rules of law as to the character of profits which may be thus claimed. It does not lie, however, in the mouth of the party who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged.at least to the amount of what he has been induced fairly and in good faith to lay out and expend (including his own services), after making allowance for the value of materials on hand; at least it does not lie in the mouth of the party in fault to say this unless he can show that the expenses of the party injured have been extravagant and unnecessary for the purpose of carrying out the contract.”
As no profits are proven or claimed we will dismiss that branch of the case, leaving to be considered the question of damages arising from the expenditures which the claimant was induced to make on the faith of the contract, together with the reasonable expenses for care and superintendence during the progress of the work.
That the claimant in good faith “laid out and expended” the amount found, on the faith of the contract, there can be no question, as the expenditures were incurred in the prosecution of the work and are found to have been necessary and reasonable, so we have included in the judgment the sums' expended for labor and materials, machinery and tools, for foreman and superintendents, and certain expenditures for blacksmith work, hauling, boat hire, and freight, amounting in the aggregate to $31,727.76, from which we have deducted *738 the amount paid claimant by the defendants and the amount they paid out for inspection during the period of the extension of the contract from .November 1, 1897, to April 30, 1898, as provided by paragraph 35 of the specifications set forth in finding hi, which extension was granted on condition that the claimant pay the expenses of inspection and superintendence during said period or until the work was completed if sooner done; we have also deducted the amount the claimant realized from the sale of a part of its material, machinery, tools, and supplies, together with the reasonable value of the remaining portion of the material, machinery, tools, and supplies on hand, amounting in the aggregate to $14,021.27, as set forth in said finding m, leaving due the claimant, after deducting the one from the other, the sum of $17,706.49, for which amount judgment is ordered to be entered.
It follows from what we have said that there can be no recovery by the defendants on their counterclaim, and as to that the petition is dismissed.