Howkat, J.,
deliA^ered the opinion of the court:
The subject-matter of this controversy is the expense involved in the repatriation of certain prisoners of Avar from the Philippine Islands succeeding the close of hostilities between this country and Spain. The issues arise on the demand of the plaintiffs, stating a total earned of $1,837,841 and claiming a balance amounting to $293,246.25 alleged to be due under two agreements, one verbal and one in writing, on account of services alleged to have been performed by them for the repatriation of 17,527 persons.
The first thing to be considered relates to the action of the parties under the alleged parol agreement. Payments for *347 large amounts were made without any written contract for the repatriation of those prisoners whose presence was deemed specially undesirable. These payments cover the first five shipments and amount to a sum aggregating $371,988.75. Defendants deny the existence of any oral agreement, and allege that until the treaty was signed an authorized agreement was impossible for the reason that the authority for an agreement could only come from the treaty itself. Restitution of the amount of the expenditures under the alleged parol agreement is demanded by way of counterclaim.
On August 12, 1898, our Secretary of State and the French minister at Washington, acting for the Spanish Government, entered into a protocol for the cessation of hostilities between the United States and Spain, in which it was provided that “ the United States will occupy and hold the city, bay, and harbor of Manila, pending the conclusion of a treaty of peace which shall determine the control, disposition, and government of the Philippines.” Manila surrendered the next day, and the authorities of the two'Governments there agreed in writing that “ all question relating to the repatriation of officers and men of the Spanish forces and of their families and of the expenses which said repatriation may occasion shall be referred to the Government of the United States at Washington.” The prisoners were then estimated to number about 16,000,. but an actual count subsequently increased the estimate to something over 17,000 persons.
No steps were taken immediately for any removal, but the necessity existed to bring about better conditions in the fallen city. The Spaniards themselves were perhaps anxious to go home, and it Avas understood by both sides that, under the terms of the capitulation, the military occupation o’f the United States was likely to be permanent. There was a large number of sick and wounded in the vicinity of Manila and elsewhere in the archipelago. These numbered more than 1,000 persons, and the presence of so many Avas a menace to the health of the place. Out of these conditions arose the actual transportation of a large number for which *348 accounts were presented and paid and from which the- first counterclaim has arisen.
It is proiDer at this point to notice plaintiffs’ contention that by the action of the accounting officers, who approved the accounts, the defendants are precluded from disputing the correctness of the payments for the five shipments in dispute.
Jurisdiction to hear set-offs was conferred by an act approved March 30, 1868, which provides for revision of settlements (15 Stat. L., 54). This statute is now section 1061 of the Revised Statutes, which, in turn, was reenacted by the first section of the Tucker Act with respect to all set-offs on the part of the Government against any claimant in this court. There is no reason to discredit the set-off merely because the accounts Avere passed upon at the Treasury. True, the presumption is that the payments Avere lawfully made, and this presumption continues until the contrary appeal’s. The fact that the action of the accounting officers (Avho generally resolve eA^ery doubt in auditing public accounts in faAmr of the Government) is under consideration at the instance of the laAV officers of the Government in no Avise diminishes the value of the demand for restitution. Quite the contrary. The very object of the statute relating to the revision of settlements is to place the action of those most responsible for them under the Avatchful care of those Avhose duty it is to appear for the Government in the courts. The right to recoA^er moneys illegally paid by a public officer exists in this court eA^en Avithout a counterclaim whenever it appears that the settlements are unlawful. (Wisconsin Central R. R. Co. v. U. S., 164 U. S., 190.)
The material inquiry, then, is the nature of the operations under which the first five shipments were made. We have carefully considered this phase of the matter because of its immediate bearing upon the claim for a large refund. As our findings are not the subject of revieAV, their importance can not be oArerestimated.
The telegraphic correspondence betAveen General Otis, commanding in the Philippines, and the Adjutant-General of the Army in Washington tends to rebut the idea of any *349 parol agreement of the first shipments at the expense of the United States. But the commander there did not, so far as this evidence shows, know that Ceballos & Co. were in consultation with the Secretary of War here. The correspondence offered in evidence does not in itself disprove the allegation that negotiations were then going on at the seat of government for the removal of the sick from the Philippine Islands to Spain. It is historically true also that negotiations were in progress at the same time for the removal of the sick and wounded prisoners of war from Porto Rico and Cuba. But there was a special necessity to get the sick and wounded from the more distant conquered territory. The correspondence recognized these conditions for the relief of a state of affairs which was as well understood by the Government at home as by the commanding general on the spot.
Careful scrutiny compels us to say we are unable to see any actual inconsistency in the testimony relating to the occurrences here with respect to the initial shipments. It positively appears from the plaintiffs’ testimony that an agreement was made with the Secretary of War. Neither the Secretary nor any civil or military authority of the Government in the War Office has ever made any denial of the direct testimony relating to the agreement. This agreement is proven by Ceballos & Co. as having been made in Washington with the Secretary of War. It is inferentially corroborated by the subsequent telegrams of the commanding general in the Philippines that in all instances the departure of the prisoners was urged and hastened. Finally, the Treasury officers were satisfied (by the response to their first objections) to make the payments for the shipments, and with the sufficiency of the agreement exhibited in the correspondence with the War Department in that connection. The findings establish the parol agreement between plaintiffs and the Secretary of War. The particulars are there set forth in the nature of a special verdict, which are believed by the court to substantially embody all that is material in the matter in dispute. Without multiplying words on this part of the case, we pass to the question of the sufficiency of the agreement.
*350 Government liability to pay anything under the parol agreement is denied by defendants because any contract, they say, with respect to the first five shipments was within section 3744 of the Eevised Statutes, and not having been “ reduced to writing, and signed bjr the contracting parties with their names at the end thereof,” can not be sued upon. Defendants cite Clark v. United States, 95 U. S., 539; Salomon v. United States, 19 Wall., 17; South Boston Iron Co. v. Same, 118 U. S., 42; 18 C. Cls. R., 165; Lindsley's case, 4 id., 359; Jones’3 case, 11 id., 733; Steele's case, 19 id., 181.
But this is a completed agreement. The service was actually performed and defendants got the benefit of it. In a recent case in the Supreme Court — affirming this court— Mr. Justice Holmes said that if the United States, instead of paying for the subject-matter of the suit there, had set up the invalidity of the contract, the claimant could still have sued on a quantum valebat. (St. Lords Hay Co. v. United States, 191 U. S., 163.) In that case the court cited the leading case of Ciarle, v. United States, supra, with approval, where it was held that if a parol contract has been wholly or q>artially executed and performed on one side the party performing will be entitled to recover the fair value of his property or service as upon an implied contract for a quantum meruit. An. examination of these two cases we think authorized settlement of the right of plaintiffs to recover on whatever the services are shown to be worth.
But there is another aspect in which this part of the case may be viewed. It has appeared that by the terms of the ■capitulation the expenses of the repatriation were referred to the United States pending the treaty. This language did not make a contract, it is true, but it certainly threw the responsibility upon our Government to consider for itself the matter of expense in the intended removal of the captives. The situation of the prisoners and tlie small naval and military force of the United States among millions of natives made it very desirable for this Government to rid the islands of Spanish influences as quickly as possible. We have already adverted to the burdens imposed by the presence of the sick and wounded. Smallpox had been prevalent and *351 there was fear of infection. The prisoners were as anxious to go as our authorities were to see them go, and it 'is reasonably certain that it was assumed (under- the terms of the capitulation) by both Governments that the United States would bear the expense incident to repatriation when that question came to be considered. That it was to be considered is evident from the terms of the agreement of capitulation. Contracts for services made in emergencies and under exigencies need not always rest upon advertisements or be in writing. (Secs. 3709 and 3732, Rev. Stat.; U. S. v. Speed, 8 Wall., 77.) The state of affiairs shown by the findings appear about as emergent as anything well could be, and the counterclaim on this point can not be sustained.
Independent of the statute authorizing parol agreements in cases of emergency, certain acts don'e in the exercise of the war power .by public agents bind the Government to pay, regardless of a contract in writing. “No one disputes the proposition,” recently said one of the ablest constitutional lawyers in the country, “ that when territory i.s acquired by conquest the President, as Commander in Chief of the Army and Navy, may continue to hold and govern it through the military authorities until such time as Congress can exercise its jurisdiction.” The functions of any sort of government in conquered territory are to preserve order, protect the lives and property of the inhabitants, and preserve the interests of the conquering power until the constitutional authority of the proper civil agencies can be established by Congress upon the cession of the territory. The situation of the prisoners and the burdens imposed by the conditions to which we have adverted as existing there made it immediately desirable to provide for the prisoners elsewhere. A commander in the field, with prisoners on his hands, with no treaty to guide their disposition, could certainly incur reasonable expenditures incident to removal without the formalities of a written agreement. -Actual necessity for quick action existed.
The Secretary of War could, of course, provide the same thing which a commander could direct. In legal contemplation the Secretary is an arm of the Executive. “ The *352 President speaks and acts through the heads of the several Departments in relation to subjects which appertain to their respective duties.” (101 U. S., 770.) Anything the President may lawfully do the head of a Department may do in his name. So, unless public money is better protected than the safety and lives of inhabitants, and unless an army of occupation must be sacrificed to emergencies, the expenditures for the removal of sick and wounded captives was a proper charge against the Treasury independent of any contract, if the Secretary of War directed it, as \ve have found he did do.
We come now to the treaty of Paris of December 10, 1898, and the written contract under it.
The treaty provided: “ The United States will, upon the signature of the present treaty, send back to Spain at its own cost the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces.” Article VI provides that “ the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain the release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.”
“ The Government of the United States will at its own cost return to Spain, and the Government of Spain will at its own cost return to Cuba, Porto Pico, and the Philippines, according to the situation of their respective homes, the prisoners caused to be released, respectively, by them under this article.”
When the treaty was promulgated, the Quartermaster-General advertised for bids for suitable vessels for the repatriation of the Spanish prisoners, estimating their number at 16,000. Plaintiffs submitted a bid for this contract, accompanied with the number and names of the vessels, which was accepted by the Secretary of War, and on March 4, 1899, a written agreement for the repatriation of the Spanish prisoners was executed by the Secretary and these plaintiffs. Under this contract the prisoners then on hand were transported, subsisted, and landed in Spain, except as hereinafter set forth. Under the terms of the contract the officers were to be repatriated on the basis of $215 for each officer and- *353 the enlisted men and other persons on the basis of $73.75 for each person.
Plaintiffs agreed for the purposes of the contract that they would provide a sufficient number of steamships for the safe and comfortable transportation of prisoners of war and such other persons as might be designated by the Secretary, with cabin accommodations for all officers and third class for steerage passengers, with ample galley accommodations, space, and ventilation for the enlisted men and other persons on board each ship, and that the subsistence furnished by the company should be equal in every respect to the army garrison rations. In consideration of faithful performance the Secretary of War agreed on behalf of the United States to pay to plaintiffs the contract price mentioned above, upon evidence that the officers, enlisted men, and other persons so designated were transported, subsisted, and delivered on shore in Spain.
Pending the execution of the treaty and the contract under it the obligation of this country to repatriate persons other .than soldiers or political prisoners was questioned by the Secretary of State. Thereupon the Secretary of War requested construction of the law officers of the Government with regard to the repatriation of the families of the officers and of civil prisoners in the hands of the insurgents. The Secretary was advised by the Attorney-General that the provisions of the contract under the treaty embraced noncombatant prisoners as well as soldiers and all prisoners captured and held by the United States or held and released by the insurgents, whether their detention was originally voluntary as to them or otherwise. His opinion was that the United States had the right to adopt as against themselves as liberal a construction of the treaty as they chose, and that this Government would not have tolerated any such impertinence or delay as would have resulted in the contractors questioning the action of the Government, and that the contract when referred to the treaty was not ultra vires the Secretary of War. (23 Opin. Atty. Gen., 14.)
No questions were raised respecting the conduct of the Government in carrying out the treaty under the construction *354 given by the Executive Departments. Nor did the accounting officers of the Treasury object to making the payments as the bills were presented. But it is now argued that it is open to grave question whether any obligation was imposed on the United States by the treaty of Paris or the contract under it to carry to Spain the civilians, the women and children, and other noncombatants, who could not properly be classed as prisoners of war.
The treaty provided that the United States would release all persons made prisoners of war by the American forces. Undoubtedly every Spaniard in the archipelago was considered a prisoner of war. Certainly no one of them could have left the islands without the permission of the commander of the American forces. The original terms of capitulation referred to this Government all questions relating to the repatriation of officers and men of the Spanish forces and of their families as well. Said the Attorney-General, the contractors had nothing to do with the construction given by this Government as to what was to be done. Certainly they had no discretion except to transport all persons tendered by the United States aboard their ships. Plaintiffs were carriers only, without opportunity or power to determine who were entitled to transportation, and had they, as carriers, undertaken to decide that question for themselves they would have done so in violation of one of the express provisions of the contract and at their own risk as for a breach. Any objection raised by the contractors as to the nature of the treaty would probably have resulted in stopping the business of embarkation. Whether the treaty obligation extended to the repatriation of monks, nuns, priests, sisters of charity, and the families of the officers and enlisted men, at the expense of this country,, does not seem to us as now presenting material inquiry under the contract.
But the most important question is as to the price to be paid for persons other than commissioned officers and enlisted men who were treated as prisoners by the United States. Plaintiffs claim that the Avives and children of all military and naval officers and of all civil officials, besides sundry cabin passengers, must be paid for at the rate of $215 for. *355 each person on all shipments. They undertake to support their contention by what they' say were the views of the Secretary of War when the shipments were being made, from which it appears that as to certain noncombatants, which included wives and children of officers and soldiers and civil prisoners, the Secretary said that the obligation of the United States was not clearly defined in the treaty and that the rates of compensation for the transportation of such persons were not set forth in the contract. Plaintiffs urge that the United States should not now persuade its courts to adjudge the obligation of the treaty so that any part of the expense incident to repatriation should be borne by Spain. Defendants contend that the contract fixed the rate to be paid for the wives and children of the military, naval, and civil officers, as well as all persons other than officers, at a rate which must exclude all these other persons from the higher rate. They rely upon the construction given to the contract by the Attorney-General, who said that there were but two rates of price to be paid for the service, and that the lower rate covered each person other than an officer transported to Spain. (28 Opin. Attorneys-General, 14.)
It is true that the cost of transportation was not defined in the treaty, but the cause of action does not grow directly out of treaty stipulation, nor is the right to recover dependent upon any part of the treaty. If it were, the jurisdiction to proceed might be questioned under section 1066 of the Revised Statutes, unless the act of 1881, commonly known as the Tucker Act, repealed the earlier statute prohibiting the exercise of jurisdiction by this court in cases dependent entirely upon treaty stipulation. Without considering the treaty obligation we pass to the contract, because plaintiffs must stand upon that, as the proximate cause of action is the contract and not the treaty.
As to this contract, the Secretary of War did say that the rates of compensation for the transportation of persons other than officers did not appear to be set forth.
But the Secretary was not undertaking to construe the' contract, and whatsoever views were advanced by him were only incidental to inquiries propounded to the law officers *356 of the Government when their advice was sought to determine his official action; for within a few days the Secretary of War notified one of these plaintiffs that civil officials and prisoners’ wives and children were entitled to passage, but that the contract provided for shipment of civil officials as officers at the higher rate, and the wives and children of officers, soldiers, and civil officials at the lower rate. -
It is urged by plaintiffs .that when they submitted their bid it was their expectation to make two classes of people and two classes of accommodation, and to receive two classes of ' payment for every person transported, whether a military or political prisoner, male or female; that the words “ other persons ” were used to designate classes, and not “ officers,” or “ soldiers ” of the captured army; that the words as used in the contract are subject to interpretation in connection with other parts of the agreement, from which it is unreasonable to suppose that it was intended that women should be transported as steerage passengers.
The phrases “ other persons,” “ persons,” or “ all other persons ” occur seven times in the contract. The higher rate related to one class and the lower rate to another class, and within the second class the contract embraced priests, nuns, sisters of charity, all women and children, and every other person designated within the term “ prisoners ” by the United States.
However proper it might seem that the families of the officers should have been given the same kind of accommodations as the officers themselves, plaintiffs can not narrow the meaning of the agreement by the restrictions which they now allege to have been their expectations — that only enlisted men were to go at the lower rate.
The fifth paragraph of the contract, being free from ambiguity, must control, unless there is something else in the contract, which, taking the agreement as a whole, operates to destroy the terms fixing the rates for the families of officers upon a different basis from the rates fixed for the officers themselves. The advertisement for bids called for cabin accommodations to be supplied to the officers, and third class, or steerage accommodations, conforming to our regulations *357 as to space, for enlisted men. The proposals were to state the price per capita for transporting officers and for transporting enlisted men and for their subsistence, and delivering them in Spain, accompanied by a guaranty that the prisoners would be comfortably cared for and subsisted while on the journey. Exactly why the advertisement for bids called for two classes instead of three classes does not appear. It does not appear that the proposal of plaintiffs to furnish the transportation conformed to the advertisement, because the proposal offered to perform at a price “ not to exceed in any case $215 for each officer and $73.75 for each enlisted man.”
Why the contracting parties still ignored the anomalous status of women and children, and other noncombatants, remains unexplained. But, though plaintiffs’ bid was accepted by the United States, the contract in evidence was executed. By its terms the higher rate was applied to officers only and the lower rate “ for each enlisted man, private soldier, or other fersonP Thus, there is nothing in the agreement, and in the negotiations leading up to the agreement, which destroys the effect of the clause fixing the rate on the basis indicated by its language. Indeed, it would seem that the minds of the contracting parties met very clearly when the proposals, and the acceptance of the same, came to be exactly defined by a written contract.
Undoubtedly both parties to the agreement expected the repatriation to include every person on the islands whom the United States regarded as prisoners of war. For plaintiffs now to claim that a rate equivalent to that bid for commissioned officers should be applied to their families would seem unjust to the Government, because the logical conclusion arising from such a contention would be a full rate for every child occupying cabin accommodations as first-class passengers, contrary to the rules and customs governing the transportation of children across the seas at a lower rate than adults. Inasmuch as the rate was not to exceed the sums indicated in the proposals, it is clear that the way was left open for a lower rate than that called for by the advertisement and the proposals in question. It is equally clear that when the parties came' to make a contract they agreed that *358 two rates should govern, and it then devolved upon plaintiffs to provide such quarters as should be safe and comfortable for all. Plaintiffs can not now be heard to say that the accommodations for those carried at the lower rate were not safe and comfortable, and before they can collect the officers’ rate for the persons hot entitled to cabin accommodations they must show that defendants imposed upon them the obligation to furnish more than it contracted to furnish.
But this does not appear. The evidence does not establish that the United States had anything to' do with the assignment of the quarters of the persons repatriated under the contract, but that these persons were merely delivered in Manila Bay to the plaintiffs’ steamers to be counted and transported according to contract. Doubtless jdaintiffs contracted upon the expectation of profit on the whole contract and got it. Whether they did or not find the contract profitable the court can not undertake to transpose the words “ other persons ” from the lower rate to the higher. The function of the court is not to make a contract for the parties.
The cause of action is on the express contract embracing all repatriations undertaken. There is nothing in the transactions of the parties outside o'f the express agreement to indicate that compensation for any service to be performed by plaintiffs was contemplated, or that they could perform any service which should be paid for on a different basis than that expressed in the writing. There is therefore no room to invoke quantum meruit. As said in Hartman v. United States (40 C. Cls. R.., 133), “the express written agreement excludes the possibility of implied contract; ” and that the minds of the parties met when they formulated their written agreement for the lower rate to include women and children seems clear from the prevailing conditions to be gathered from the official correspondence, which shows that early doubts existed as to who were to be regarded as prisoners. But the parties proceeded upon the assumption that civil officials and women and children were to go and constructed their agreement accordingly. That this agreement was mutually satisfactory and profitable to both must be concluded from what the agreement itself shows and the circumstances *359 under which it was made. Some doubts as to whether civil officials and women and children were to be regarded as prisoners at all entitled to transportation under the treaty must have been shared by the Government of Spain also, because we find that Government giving orders to its subsidized company under its contractual relations with that company to cooperate with plaintiffs in the premises. Spain apparently believed that this Government was doing what in any view of the case it contracted to do under the treaty in providing for all classes in a safe and comfortable way, as no claim was then made upon this Government to do more. None could have been made under the treaty as to the kind of accommodations extended by the United States after it appeared that the accommodations provided were reasonably comfortable and safe. The repatriation of women and children alone involved an expenditure of several hundred thousand dollars by this Government, and as the matter stands it seems just for it to end.
Assuredly plaintiffs ought not to expect a judgment in their favor for the part paid by Spain to the Compania Transatlántica for coming into the matter to make more easy the journey to the peninsula for the women and children. In no event are plaintiffs entitled to anything- for the service performed by others and paid for by Spain with neither compulsion nor request.
Under the construction we have given to this part of the agreement all children must be paid for at the uniform rate fixed for enlisted men and other persons. The amounts paid in settlement of some of tlie shipments were for minors at the rate of $36.87-J each. By these settlements it appears that two minor children were treated as one person. Plaintiffs are entitled to collect the round rate fixed for all persons other than officers as above stated, irrespective of the first settlements. These settlements had their origin in the presentation of accounts for transportation on those shipments made in advance of any written agreement under the treaty. The findings show that these accounts were presented on the five shipments pursuant to the oral agreement, and the question of compensation for those persons transported before *360 the written contract was left open to be settled when the United States was prepared to ask for tenders. The first shipments were to be paid for on the written contract, which was expected to be made and which in point of fact was made. So, 'the written contract under the treaty fixed the rate payable for all persons transported under the oral agreement. Plaintiffs may have expected the written agreement to conform to their ideas of what should be paid for all the service, but as they entered into a written contract which defined the rate there must be an application of the rate agreed upon for all persons repatriated.
Another question has arisen relating to the number transported on the last fifteen shipments. This dispute relates to the passages for 198 persons, some on the basis fixed for officers and some at the rate provided for the transportation of enlisted men.
Masters of vessels certified to the landing of so many persons on many vessels, for which accounts were presented and paid without question.. But this system was changed as to the last fifteen shipments, so that requests for transportation were required to be made and quartermasters’ requisitions for transportation were certified to the carriers at the place of embarkation. No objections were offered at the time to the new method of computing the number of persons. The record does not disclose that any protest was" offered at any time to the new plan. Plaintiffs now contend that unless the report of the American consul at Barcelona, in Spain (who must have obtained his information from the vessel masters as to the number landed at home), be accepted and paid for the carriers are thereby “ made responsible for and held to perform the duty which the United States had assumed in the treaty with Spain and which they had no power or authority to delegate “ to others,” thereby.meaning that quartermasters’ requisitions were an infringement on the rights of the carriers as measured by the treaty obligation.
But this obligation of thq United States was to return at its own cost to Spain all prisoners released or caused to be released under the sixth article of the treaty. It nowhere *361 appears that this obligation was violated. Neither does it appear that the United States demanded the transportation of persons outside of the requisitions. Secondly, it is objected that unless the report of the master of each vessel of the number landed at home be accepted the contract itself is violated. We do not think so. The contract provides that “ an account of the number of officers, enlisted men, or other persons be taken at the time of embarkation by a representative of the Government of the United States and a representative of the said J. M. Ceballos & Co., and payment to the said company shall be made on the basis of the number of officers and enlisted men and persons counted on each ship.”
Unless the means adopted to secure the integrity of the count so operated as to cause the carriers to repatriate prisoners not covered by the quartermasters’ requisitions the contract- is not violated. The proof is insufficient to show that, either at the time of the promulgation of the new requirement or during the shipments under the requisitions, the carriers undertook to transport or actually transported more prisoners than the number contained in the requisitions. The burden of proof rests upon them to show that the account of the number landed across the water included “ prisoners ” in excess of the official count at the place of embarkation. The onus is equally upon plaintiffs to show that when the official account came to be taken at the time of embarkation of the persons classed as prisoners Ceballos & Co. were deprived of the right to verify the requisitions at the starting point. It is not to be supposed that plaintiffs would receive 198 persons on board not entitled to transportation — some chargeable at the rate of $215 and others at the rate of $73.75 each — and take action only by sending from Spain a list not covered by the requisitions at Manila. The Government was not bound to depend upon the master’s statement of the number carried or upon the statement of some one in Spain as to the number who appeared to have been carried, because that provision of the contract which required the prisoners to be designated at the time of embarkation afforded that measure of protection which the *362 Government was entitled to have under the contract and which must govern the number designated as prisoners. Why should plaintiffs neglect at the place of embarkation and against their interest that provision of the agreement which authorized their representative to count the number designated for transportation? The count was to be taken at the time of embarkation and the place for the count was where the prisoners embarked. (The advertisement called for place while the contract designated time.) That was to insure the repatriation of prisoners only, which was the thing, apparently, which plaintiffs now seek to evade. The requisitions of quartermasters were merely the means employed to attain certain ends — that is, the requisitions were introduced to determine who were entitled to transportation where both parties to the agreement could see that no imposition was made the one upon the other. There is nothing inconsistent in the means employed to secure the proper execution of the agreement. Certainly there is nothing unfair disclosed, and without something more definite in the way of proof to establish injury to plaintiffs the transportation of the 198 persons alleged to have been carried outside of the requisitions can not be charged to the' United States. Especially is this rule proper in view of the fact that many persons were carried to Spain who were not properly classed as prisoners of war and did not claim to be.
For the transportation of 100 other prisoners embarked in the first twenty-five sailings and not landed in Spain defendants urge that the contract has been broken by plaintiffs ; and inasmuch as these have been paid for, the Government wants restitution, and counterclaims to the extent of $12,788.75.
It appears that 118 of the prisoners died on the passage, and 42 stopped on the way. The contract provides for all transportation to be due and payable upon evidence that the officers, enlisted men, or other persons were transported, subsisted, and delivered on shore in Spain. The number to be paid for is fixed by that other paragraph in the agreement which provides for an account of the number of prisoners embarking. • The findings show that when the prisoners *363 were delivered on board, some were ill. The shipments included wounded as well as sick persons.
We do not think that another and different mode of payment than that fixed by the contract at the place of embarkation ought now to be insisted upon,, unless plaintiffs are clearly in fault. It would seem unjust, after the parties have agreed upon one basis of computing payment, for the Government to claim settlement by another method not in conformity with that part of the contract, unless plaintiffs are themselves responsible for neglect in performing their part' of the agreement.
The rule of travel upon the high seas is that when a person dies on the passage he shall be buried at sea, and by this rule plaintiffs ought to recover for the persons designated to be carried, but who died on the passage. There is no proof of any steamship line furnishing accommodations and undertaking to transport people abroad and refunding passage money for those who die on the way. There may be such a rule somewhere, but the Government has not undertaken to show it. Without knowledge of such-a provision in the ordinary contract of transportation this court will not undertake to deprive plaintiffs of their expenditures in this behalf. '
As to those persons who stopped on the way, we do not accept plaintiffs’ contention that the prisoners were under the control of the United States after their delivery aboard ship. Neither is this contention necessary to maintain their claim in this respect. Having provided means for the transportation of all such prisoners as were tendered, it would seem unreasonable to hold that it is incumbent on plaintiffs to show that they failed to land these persons in Spain. When the prisoners went on board the vessels designated to carry them they were there pursuant to the agreement. The prisoners were no more under the control of plaintiffs, except as passengers, than under duress on the part of the United States. If,’ without the permission of the carriers, these persons got off, plaintiffs should not be held responsible.
Certain amounts representing payments for officers and *364 men in excess of the number actually transported, on one of the ships are set forth by the defendants by way of counterclaim. The amount of refund demanded is $9,721.25. The contention on this item grows out of the certificates of the masters of the vessels and the certificate of the quartermaster in charge of transportation matters at the place of embarkation. The findings show the proper deductions on the counterclaim.
Summarizing the matters in dispute, we find that a preliminary agreement in parol for the transportation of sick and wounded prisoners of war was made between plaintiffs and defendants after the surrender of the Spanish forces in the Philippine Islands, but before any contract under the treaty .was made, and the plaintiffs performed services under the agreement for which they were rightfully paid for the five initial shipments; that the matter of compensation for these five initial shipments was, by verbal agreement between the parties, to be fixed by subsequent written agreement under the treaty of peace; that the written agreement made after the promulgation of the treaty established a rate of compensation applicable to all shipments of $215 for each civil, naval, and military officer, and $73.75 for all shipments of enlisted men and every other person treated as a prisoner by the United States, and that under the •finding in this behalf plaintiffs were properly paid the amounts received on the first five shipments.
The conclusion follows that the counterclaim of $371,988.75 must be rejected. Next, that under the written contract, plaintiffs are entitled to collect on the whole account $215 for each officer, civil and military, and $73.75 for each enlisted man and every other person treated as prisoners and transported as such. There results to plaintiffs the right to collect the full rate fixed for enlisted men and others for each child delivered as a prisoner to plaintiffs for transportation. That as to 198 persons not covered by quartermaster’s requisitions, but claimed by plaintiffs, to have been carried to Spain, nothing can be paid to plaintiffs, because they were not properly designated as prisoners or treated by the parties at the place of embarkation as persons entitled *365 to passage at the expense of the United States; that as to 118 prisoners who died on the passage and 42 who stopped on the way plaintiffs are entitled to collect the rates fixed by the written contract, because the said plaintiffs are not responsible for the failure to deliver these persons on shore in Spain after the Government had imposed that duty upon them by delivery of these persons to the plaintiffs’ steamships. It follows from this conclusion that the second counterclaim of $12,778.75 must be rejected; that there was an overpayment for certain military officers and certain enlisted men, in excess of the number of officers and men actually transported, of $9,721.25, and as to this amount the defendant’s third counterclaim is sustained.
The total number of prisoners delivered aboard plaintiffs’ ships which were designated according to the contract at the place of embarkation to be transported.in accordance with the agreement was 17,305, of whom 1,938 were military and civil officers and 15,367 were enlisted men and other persons treated as prisoners of war by the United States. Plaintiffs have been paid under the parol agreement and the written contract $1,544,595. Deducting the amount of the third counterclaim and allowing for all naval, military, and civil officers at the highest rate named in the contract, and for all enlisted men and other persons at the lowest rate named therein, the total amount which plaintiffs are entitled to have for their services is $1,549,986.21. The net result found due and unpaid from the United States to the jfiaintiffs for all the services is $5,391.25, for which judgment will be entered.