Appeal of PRODUCERS FUEL CO.        Docket No. 159.

> A liability to respond in damages for the breach of a contract occurring in the regular course of the taxpayer's business is a liability incurred at the time of the breach, and an approximately accurate estimate of such damages, set up on the taxpayer's books as a reserve to meet such damages, may be properly claimed as a deduction from gross income for the taxable year within which the breach occurred, although the exact amount required to liquidate such damages may not be determined until a later period.
>
> When, however, a taxpayer's return is under review by this Board, the amount of a deduction on account of a breach of contract must be considered in the light of subsequent events, and when such subsequent events show that the actual damages, as finally liquidated, differ from the reserve originally set up and claimed, the final figure of damages will be substituted for the reserve in the Board's determination of a taxpayer's liability to income and profits taxes.
>
> Upon an application for special relief under the provisions of sections 327–328 of the Revenue Act of 1918, decision is reserved pending consideration and determination of the Commissioner.

Submitted October 31, 1924; decided December 18, 1924.

*G. M. Cumming, Esq.,* and *James Walton, Esq.,* for the taxpayer.

*Robert A. Littleton, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal was argued upon the petition and answer and a stipulated statement of facts, to which were appended copies of two contracts between the taxpayer and coal mining companies, from which the Board deduces the following:

FINDINGS OF FACT.

In the latter part of the year 1920 the taxpayer held two certain contracts with Campbell, Peacock & Kinzer, Inc., Philadelphia, Pa., and the Monongahela Powder Co., of Fairmont, W. V., respectively. These contracts, in substance, provided for the purchase by the taxpayer of large quantities of coal at stated prices, which contracts the taxpayer in December, 1920, breached. Negotiations were entered into between the respective parties with a view to arriving at a settlement of taxpayer's liability and these negotiations culminated in the taxpayer, through J. K. Barber, its president, in the

month of December, 1920, making an unqualified offer to Campbell, Peacock & Kinzer, Inc., of $15,000 by way of full payment of its liability under the contract. This offer was made in the taxpayer's office in Pittsburgh, Pa.

In the case of the Monongahela Powder Co., the taxpayer, through E. C. Bates, its vice president, on December 11, 1920, made an offer of $4,500 by way of full payment of its liability. This offer was made in person by Mr. Bates at the office of the Monongahela Powder Co. in Fairmont, W. Va.

The negotiations were still pending December 31, 1920, when, on closing its books, the taxpayer provided reserves of $30,000 and $7,500, respectively, to cover the two liabilities. Subsequently, on January 24 of the following year 1921, an agreement was reached as to the amount of the Monongahela Powder Co. liability and settlement duly made for $5,500. On January 29, 1921, a plan of settlement was agreed to for the Campbell, Peacock & Kinzer, Inc., contract, under which plan the taxpayer finally paid, by November 1, 1921, a total of $29,792.40.

The books of the taxpayer were kept and its returns filed on an accrual basis.

In drafting its 1920 tax return, the taxpayer took as deductions in arriving at taxable income both sums of $30,000 and $7,500 aforesaid. The Commissioner proposes to disallow them in their entirety.

The contract between the taxpayer and Campbell, Peacock & Kinzer, Inc., contains, among other things, pertinent provisions as follows:

The Seller hereby agrees to sell to the Buyer twenty-four thousand (24,000) net tons of coal from mine known as Penn Mine, situated in Clark District, Harrison County, W. Va., now scheduled as Pool 34 coal, the same to be delivered in approximately equal monthly shipments of two thousand (2,000) tons per month, these shipments to begin at once.

The said Buyer hereby agrees to purchase the coal hereinabove specified, and to pay therefor the sum of four and 75/100 ($4.75) dollars per net ton, according to railroad weights as aforesaid, which said amount shall be paid by the Buyer to the Seller in semimonthly payments on the 15th day and the last day of each and every month. It is understood and agreed that the Buyer shall pay for all coal shipped during the first half of any one month on or before the last day of the said month, and for all coal shipped during the last half thereof, payment shall be made on or before the 15th of the following month.

It is further understood and agreed that each month's delivery of two thousand (2,000) net tons of coal shall be taken and considered as a separate and independent contract. The Seller shall not be responsible, however, for the delivery of the full amount of the month's delivery if prevented or delayed by strikes or combinations of miners or laborers, accidents in or about the mines, interruption or shortage of transportation, or by any cause or occurrences beyond its control, and in any such case the Seller shall be obliged to ship hereunder only such proportion of its total then current shipments from said mine as the quantity herein specified for shipment during said period bears to the railroad rated capacity of the said mine for such period, and in any such case no liability shall be incurred by the Seller from damages resulting therefrom. In the event the said Seller does not ship the full amount of two thousand (2,000) net tons of coal during any one month for the reasons as herein specified, no liability shall be incurred to make shipment of the deficiency during any succeeding month.

It is further understood and agreed that the monthly shipments of coal hereinbefore specified shall be at least 25 per cent of the monthly output of said mine. The coal is to be shipped as and at such times as the Buyer may direct, and subject to any and all rules and regulations that may be imposed

by the Fuel or Railroad Administration, or any other governmental body which may have jurisdiction at any time during this contract, provided, however, that no such rule or regulation shall change the price of the said coal. In the event of any rule or regulation as aforesaid, fixing the price per ton which the said Seller may accept for said coal at less than four and 75/100 ($4.75) dollars, then the said Seller shall have the right or option to terminate this agreement, whereupon the parties hereto shall be mutually released herefrom.

In the event the said Buyer defaults in any payment for said coal for a period of five (5) days, then the Seller shall have the right to terminate this agreement, and shall not be liable for the shipment of any additional coal under the terms hereof.

The contract between the taxpayer and the Monongahela Powder Co., although written in a different form, states obligations of the parties not materially different from the provisions of the Campbell, Peacock & Kinzer, Inc., contract.

The Commissioner, in his audit of the taxpayer's return for income and profits taxes for the year 1920, disallowed the claimed deduction on account of losses growing out of operations under the two contracts and did not compute the profits tax under sections 327 and 328 of the Revenue Act of 1918 for either of the years 1919 or 1920, and from the adjustments of net income and tax liability made by the Commissioner for each of said years the taxpayer brings this appeal.

### DECISION.

In arriving at this taxpayer's net income for the year 1920 there must be deducted from gross income the loss growing out of the breach of the contract with the Monongahela Powder Co. in the sum of $5,500 and the loss growing out of the contract with Campbell, Peacock & Kinzer, Inc., of $29,792.40.

This appeal will be restored to the calendar and the Commissioner allowed a period of 30 days within which he may either accede to or refuse to consider or allow the taxpayer's request for relief under sections 327 and 328 of the Revenue Act of 1918, and at the close of such period the taxpayer may move before this Board for such further proceedings as the Board deems necessary to the final determination of this appeal.

### OPINION.

TRUSSELL: This appeal presents for consideration two questions relating to the application of the Revenue Act of 1918 in determining the total income and profits tax liability of this taxpayer for the calendar years 1919 and 1920. The first question is the amount of net taxable income for the year 1920 and the second the application of the taxpayer for special assessment under the provisions of sections 327 and 328 of said Act for both the years 1919 and 1920.

This taxpayer, during the periods under review, was engaged in the business of a coal broker. In carrying on this business it was its practice to make contracts with coal mining companies for the delivery to it or upon its order of stipulated quantities of coal at agreed prices and for fixed periods of time. The taxpayer itself was not the owner or operator of any coal mines or mining operations. It carried on its business by entering into contracts for the purchase and delivery of coal and thereafter securing buyers for

such coal as it was under contract to purchase. In this manner it carried on a large but variable business, its gross sales in the year 1920 exceeding $10,000,000.

In the course of its operations it did on or about May 11, 1920, enter into a contract with the Monongahela Powder Co., hereinafter called the Monongahela contract, by the terms of which the Monongahela Powder Co. agreed to sell, and this taxpayer agreed to buy, 15,700 net tons of coal at the fixed price of $4.15 per net ton of 2,000 pounds f. o. b. at the seller's mines; said amount of coal to be delivered upon the order of this taxpayer at the rate of approximately 1,500 tons per month and the contract to be completely performed between the dates of May 15, 1920, and March 31, 1921. On or about the 27th day of May, 1920, the taxpayer entered into a contract with Campbell, Peacock & Kinzer, Inc., a mining corporation, hereinafter referred to as the Campbell contract, by which the Campbell company agreed to sell, and this taxpayer agreed to buy 24,000 net tons of coal at a rate of delivery of approximately 2,000 tons per month and the contract to be completely performed between the dates May 27, 1920, and May 31, 1921, and the contract price of the coal under this contract was fixed at $4.75 per net ton according to railroad weights. While these two contracts appear to affect only a small part of the total business of this company for the year 1920, the operations under them present the only issue with respect to the amount of net taxable income raised in this appeal.

Immediately upon the execution of these contracts all the parties thereto entered upon and performed all their respective duties and obligations until on or about December 1, 1920, when it appears that due to an abnormal and unexpected slump in the selling prices of coal in the general market this taxpayer found that it could no longer sell the quantities of coal agreed to be purchased from month to month under these contracts without sustaining heavy losses and it appears that thereupon the taxpayer chose deliberately to breach these contracts and to default its obligations thereunder.

Having committed this breach of contract and defaulted in its obligations the taxpayer, of course, at once realized that it was in a position to be called upon to respond in damages in such an amount as the sellers in the contracts would be able to recover on account of the taxpayer's failure to carry out its obligations, and with little delay the taxpayer began negotiations with a view to a compromise and settlement of such claims for damages as the selling companies could be found to have the right to recover and in this effort to compromise these liabilities it made definite offers of settlement, both to the Campbell company and the Monongahela company, offering to pay to the former as liquidated damages the sum of $15,000 and to the latter the sum of $4,500, in compromise and settlement of the taxpayer's liability to said companies under their contracts. These negotiations began in the month of December, 1920. The proposed offers of settlement, however, were not promptly accepted and negotiations were still pending when the taxpayer closed its accounting period on December 31, 1920, at which time the taxpayer, realizing its liability growing out of its default upon these contracts, made an estimate of the probable amount of such

liabilities upon each of said contracts and estimated the liability under the Campbell contract to be $30,000, and under the Monongahela contract to be $7,500, and set these respective sums upon its books as an accrued liability of its business for the calendar year 1920, and claimed each of said sums 'as a deduction from gross income when it made its income and profits tax returns for said year.

Thereafter it continued its efforts to compromise and settle these liabilities and ultimately succeeded in affecting such settlements. Liability under the Monongahela contract was settled on or about January 24, 1921, by the payment of the sum of $5,500. On or about January 29, 1921, a plan of settlement was agreed to with the Campbell company, under which this taxpayer, between that date and November 1, 1921, paid damages in the total sum of $29,792.40.

In support of its contention that it was and is entitled to claim the amount set up on its books 'as herein stated as deductions from gross income for the year 1920, the taxpayer relies, among other things, upon the following authorities:

Revenue Act of 1918, section 234(a)—

That in computing the net income of a corporation  *  *  *  there shall be allowed as deductions:

*       *       *       *       *       *       *

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise.

Regulations 45, article 111, where the following language occurs:

*  *  *  A person making returns on an accrual basis has the right to deduct all authorized allowances, whether paid in cash or set up as a liability.  *  *  *

In addition to the foregoing, the taxpayer's brief quotes a number of other pronouncements of the Internal Revenue Bureau, all in line with the foregoing quotations.

We are thus led to what appears to be the vital question in this case: Whether the losses or damages to which this taxpayer became subject on account of the breach of the contracts and for which reserves were set up were liabilities actually incurred during the year 1920.

These contracts were entered into during the month of May, 1920, and from the date of their execution until approximately December 1, 1920, all of the parties to these contracts fulfilled their obligations thereunder and any profits or losses growing out of these business transactions were no doubt reflected on the taxpayer's books in its regular method of accounting. On or about December 1, 1920, the taxpayer found that if it continued to operate under these contracts it faced the certainty of heavy losses on account of the slump in the selling price of coal. Thereupon, with the view, no doubt, of minimizing such losses to the greatest possible extent, it broke off its contractual relations, became in default in its obligations, and the other parties to the contracts, in pursuance to the terms thereof, terminated the contracts. All the parties thereto then entered upon negotiations looking to 'a compromise of the liabilities of this taxpayer.

The taxpayer's computation of its liability for the breach of these contracts, may, in the absence of other evidence, be accepted, when

its return is made, as a reasonable calculation of the amount that it could be called upon to pay in damages.

The taxpayer's liability for damages on account of the breach of these contracts was a liability actually incurred at the date of the breach. In *Donovan* v. *Sheridan*, 24 New York Supplement, 116, the court says:

> The law is settled that an action for breach of contract will lie at once upon a positive refusal to perform, although the time specified for performance has not arrived (citing *Burtis* v. *Thompson*, 42 N. Y. 246, and other cases).

Corpus Juris, vol. 13, 651, states the general rule of law as follows:

> Where a party bound by an executory contract repudiates his obligation before time for performance, the promisee has, according to the great ·weight of authority, an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach. The rule is the same whether the contract is wholly executory or has been partially executed.

Further support of the general rule of law above quoted and of the taxpayer's contention in this case is found in *United States* v. *Purcell Envelope Co.*, 249 U. S. 313, where the court says:

> The Court of Claims decided that the measure of damages was the difference between the cost to the envelope company of materials and the manufacture and delivery of the envelopes and wrappers in accordance with the terms of its contract and what it would have made if it had been allowed to perform the contract. For this the court cited and relied upon *Roehm* v. *Horst*, 178 U. S. 1, 44 L. ed. 953, 20 Supreme Court Reporter 780. It is there decided that the positive refusal to perform a contract is a breach of it, though the time for performance has not arrived, and that liability for the breach at once occurs. And it is further decided that the measure of damages is the difference between the contract price and the cost of performance. The case was replete in its review of prior cases. We may refer, however, to *United States* v. *Speed*, 8 Wall. 77, 85, 19 L. ed. 449; *United States* v. *Behan*, 110 U. S. 338, 28 L. ed. 168, 4 Supreme Court Reporter 81; *Hinckley* v. *Pittsburgh Bessemer Steel Co.*, 121 U. S. 264, 30 L. ed. 967, 7 Supreme Court Reporter 875.

Under these contracts as originally made operations were expected to continue in the one case from May, 1920, to March, 1921, and in the other from May, 1920, to May, 1921, but owing to the breach and default which occurred in December, 1920, contractual relations were terminated and operations under such contracts ceased, and all opportunity for the production of either profits or losses passed, and there was nothing further to be done under these contracts except to arrive at a settlement of the taxpayer's liability. We therefore arrive at the conclusion that the taxpayer's liability to damages and losses under these breached contracts was incurred in the month of December, 1920, and at that time became a fixed liability for which it was entitled to claim a deduction from gross income · for the year 1920.

While it appears that at the end of the year 1920 this taxpayer estimated its liability under the breached contracts with approximate accuracy and set the sum up on its books of account and then made its income and profits tax return in accordance with such books, we have now before us a review of that income and profits tax return and in making such review it is our duty to consider not only the facts known and recorded at the close of December, 1920, but also those same facts as modified by subsequent events. These

subsequent events have developed the fact that the damages and losses sustained by the taxpayer on account of the breach of the Monongahela contract were settled for the sum of $5,500, and that the damages and losses sustained by the taxpayer on account of the breach of the Campbell contract were finally determined and settled for the sum of $29,742.40. With these facts before us, and for the purpose of determining the final net taxable income of the taxpayer for the year 1920, the amounts of damages and losses as finally determined must now be substituted for the estimate originally made, and in place of the deductions claimed by the taxpayer in his return and disallowed by the Commissioner the losses and damages as finally settled must be allowed as the deduction contemplated by the law.

TRAMMELL, MARQUETTE, and SMITH dissent.